No. 21-8088

# In the United States Court of Appeals for the Tenth Circuit

C. MARK CUPPS, *et al.*,

*Plaintiffs-Appellants*,

v.

PIONEER CANAL-LAKE HATTIE IRRIGATION DISTRICT,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Wyoming, No. 2:16-cv-00086-SWS
Honorable Scott W. Skavdahl, Presiding

## APPELLANTS' OPENING BRIEF

Respectfully submitted,

Brandon L. Jensen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
brandon@buddfalen.com

ORAL ARGUMENT IS REQUESTED
SCANNED PDF FORMAT ATTACHMENTS ARE INCLUDED

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for the Appellants states the following:

Appellant Laramie Boat Club, Inc. is an association of private individuals; there are no parent corporations and no publicly held corporation owns ten-percent or more of its stock.

Dated January 26, 2022

/s/ Brandon L. Jensen
Brandon L. Jensen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
brandon@buddfalen.com

*Attorney for Appellants*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT....... ........ ....... ....... ....... ....... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....... ....... 1

STATEMENT OF THE CASE  ... ....... ........ ....... ....... ....... ....... 2

STATEMENT OF FACTS .. ....... ....... ........ ....... ....... ....... ....... 5

SUMMARY OF ARGUMENT ..... ....... ........ ....... ....... ....... ....... 14

ARGUMENT .... ....... ....... ....... ....... ....... ....... ....... ....... ....... 15

    I.    STANDARD OF REVIEW ON APPEAL ... ....... ....... ....... ....... 15

    II.    THE DISTRICT COURT WAS NOT EMPOWERED TO
        RELOCATE THE RIGHT-OF-WAY'S BOUNDARY LINES
        IN ANY POSITION OTHER THAN THOSE ESTABLISHED
        BY THE ORIGINAL SURVEYOR . ........ ....... ....... ....... ....... 16

        a.    The district court erred by disregarding
            the approved survey of the right-of-way
            for the Lake Hattie Reservoir.... ....... ....... ....... 19

        b.    The district court erred by relying on factors
            that this Court explicitly determined to be
            irrelevant  ....... ....... ........ ....... ....... ....... ....... 28

        c.    The district court erred in disregarding the
            survey of the right-of-way boundary performed
            by the BLM ..... ....... ........ ....... ....... ....... ....... 33

        d.    The district court erred in establishing the
            boundary of the right-of-way for the Lake
            Hattie Reservoir based upon the elevation
            of the reservoir's dam....... ....... ....... ....... ....... 44

e.    This Court should not be persuaded that a right-of-way based on the original map would ignore the practical infeasibility of using the Irrigation District's water rights ....... 47

f.    Conclusion...... ....... ........ ....... ....... ....... ....... 49

III.    THE DISTRICT COURT ERRED IN CONCLUDING THAT THE BOUNDARY OF THE RIGHT-OF-WAY INCLUDES AN ADDITIONAL FIFTY FEET ALONG THE MARGINAL LIMITS THEREOF... ....... ....... ....... ........ ....... ....... ....... ....... 54

CONCLUSION   ....... ....... ....... ........ ....... ....... ....... ....... 56

STATEMENT REGARDING ORAL ARGUMENT.. ....... ....... ....... 57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT...... ....... ....... ........ ....... ....... ....... ....... 58

CERTIFICATE OF DIGITAL SUBMISSION . ....... ....... ....... ....... 59

CERTIFICATE OF SERVICE..... ....... ........ ....... ....... ....... ....... 60

ATTACHMENTS....... ....... ....... ....... ........ ....... ....... ....... ....... 61

Findings of Fact and Conclusions of Law, November 17, 2021 . ....... ....... ........ ....... ....... ....... ....... 62

Judgment, November 17, 2021 . ....... ....... ........ ....... ....... ....... ....... 94

# TABLE OF AUTHORITIES

**CASES:**

<u>Aquila, Inc. v. C.W. Mining</u>,
545 F.3d 1258 (10th Cir. 2008) ....... ........ ....... ....... ....... .......  15

<u>Benham v. Ozark Materials River Rock, LLC</u>,
885 F.3d 1267 (10th Cir. 2018) ....... ........ ....... ....... ....... .......  15

<u>Brackett v. Cleveland</u>,
363 P.2d 1050 (Colo. 1961) ..... ....... ........ ....... ....... .......      26-27

<u>Caldwell v. United States</u>,
250 U.S. 14 (1919) .. ....... ....... ....... ........ ....... ....... ....... .......  17

<u>Combs v. Valentine</u>,
137 S.W. 1080 (Ky. 1911) ....... ....... ........ ....... ....... ....... .......  27

<u>Craft v. Thompson</u>,
405 So. 2d 128 (Miss. 1981) .... ....... ........ ....... ....... ....... .......  26

<u>Cragin v. Powell</u>,
128 U.S. 691 (1888) ....... ....... ....... ........ ....... ....... ....... .......  26

<u>Cupps. v. Pioneer Canal-Lake Hattie Irrigation Dist.</u>,
799 F. App'x 571 (10th Cir. 2019) ..... ........ ....... .......viii, 3, 4, 5, 6,
                                    19, 20, 28-29, 47, 50-51, 55

<u>Fed. Crop Ins. Corp. v. Merrill</u>,
332 U.S. 380 (1947) ....... ....... ....... ........ ....... ....... ....... .......  43

<u>Galt v. Willingham</u>,
11 F.2d 757 (5th Cir. 1926) ...... ....... ........ ....... ....... .......       25-26

<u>Hagerman v. Thompson</u>,
235 P.2d 750 (Wyo. 1951) ....... ....... ........ ....... ....... .......        24, 42

<u>Higueras v. United States</u>,
72 U.S. 827 (1864) .. ....... ....... ....... ........ ....... ....... ....... .......  37

Larsen v. Richardson,
260 P.3d 103 (Mont. 2011) ...... ....... ........ ....... ....... .......    23, 25

Missouri, K. & T. Ry. Co. v. Cook,
163 U.S. 491 (1896) ....... ....... ....... ....... ....... ....... .......    18

Nourachi v. United States,
655 F. Supp. 2d 1215 (M.D. Fla. 2009) ..... ....... ....... ....... .......  26

Olguin v. Lucero,
87 F.3d 401 (10th Cir. 1996) .... ....... ........ ....... ....... ....... .......  15

Russell v. Maxwell Land-Grant Co.,
158 U.S. 253 (1895) ....... ....... ....... ........ ....... ....... .......    43, 47

Silver King Coalition Mines Co. v. Conkling Mining Co.,
255 U.S. 151 (1921) ....... ....... ....... ........ ....... ....... ....... .......  34

Sorenson Communications, Inc. v. FCC,
567 F.3d 1215 (10th Cir. 2009) ....... ........ ....... ....... ....... .......  44

State of Ark. v. State of Tenn.,
269 U.S. 152 (1925) ....... ....... ....... ........ ....... ....... ....... 23, 39-40

Tarpey v. Madsen,
178 U.S. 215 (1900) ....... ....... ....... ........ ....... ....... ....... .......  18

Town of Union v. Strong,
681 A.2d 14 (Me. 1996) ... ....... ....... ........ ....... ....... ....... .......  23

Union Land & Stock Co. v. United States,
257 F. 635 (9th Cir. 1919) ....... ....... ....... ....... ....... ....... .......  16

United States v. Big Bend Transit Co.,
42 F. Supp. 459 (E.D. Wash. 1941) . ........ ....... ....... .......    27-28

United States v. Doyle,
468 F.2d 633 (10th Cir. 1972) .. ....... ........ ....... ....... .......    24, 51

United States v. Lane,
260 U.S. 662 (1923) ....... ....... ....... ........ ....... ....... ....... .......  24

United States v. Redondo Development Co.,
254 F. 656 (8th Cir. 1918) ....... ....... ........ ....... ....... ....... ....... 34

United States v. State Investment Co.,
264 U.S. 206 (1924) ....... ....... ........ ....... ....... ....... ....... 24

WildEarth Guardians v. United States Bureau of
Land Mgmt., 870 F.3d 1222 (10th Cir. 2017)..... ....... .......    43-44

Wilmer v. Board of County Commissioners of
Leavenworth County, 69 F.3d 406 (10th Cir. 1995) ... ....... ....... 56

Wisconsin Cent. R. Co. v. United States,
164 U.S. 190 (1896) ....... ....... ....... ........ ....... ....... ....... ....... 17

**STATUTES:**

An act to repeal timber-culture laws, and for other
purposes, ch. 561, §§ 18-22, 26 Stat. 1095 (1891) ... ....... 1, 16, 54

28 U.S.C. § 1291 ..... ....... ....... ....... ........ ....... ....... ....... ....... 1

28 U.S.C. § 1331 ..... ....... ....... ....... ........ ....... ....... ....... ....... 1

43 U.S.C. § 946 ....... ....... ....... ....... ........ ....... ....... ....... 16, 54, 55

43 U.S.C. § 947 ....... ....... ....... ....... ........ ....... ....... ....... ....... 16

43 U.S.C. § 949 ....... ....... ....... ....... ........ ....... ....... ....... ....... 54

43 U.S.C. § 1761(a) . ....... ....... ....... ........ ....... ....... ....... ....... 28

44 U.S.C. § 1507 ..... ....... ....... ....... ........ ....... ....... ....... ....... 42

## REGULATIONS:

Regulations for Rights of Way Over Public Lands
and Reservations, 36 Pub. Lands Dec. 567 (1908).... ....... 17, 18, 54

Instructions, Reservoir Rights of Way Under Act of
March 3, 1891, Circular No. 1291,
54 Pub. Lands Dec. 141 (1933) ....... ........ ....... ....... ....... ....... 13

## ADMINISTRATIVE CASES:

Windsor Reservoir and Canal Company v. Miller,
51 Pub. Lands Dec. 27 (1925) . ....... ........ ....... ....... ....... ....... 55

## MISCELLANEOUS:

Classification Order No. 10,
16 Fed. Reg. 9288-89 (Sept. 13, 1951)...... ....... .......    9, 12, 48, 49

11 C.J.S. *Boundaries* § 7 . ....... ....... ........ ....... ....... ....... ....... 26

United States Bureau of Land Management,
*Manual of Surveying Instructions* (1947).... ....... ....... ....... ....... 24

Walter G. Robillard *et al.*, *Evidence and Procedures
for Boundary Location* (6th ed. 2011) ........ ....... ....... .......22, 35, 41

Walter G. Robillard & Donald A. Wilson, *Brown's
Boundary Control and Legal Principles* (7th ed. 2014). .......25, 26, 41

## PRIOR RELATED APPEALS

Appeal No. 17-703. Pioneer Canal-Lake Hattie Irrigation District's *Petition for Permission to File Interlocutory Appeal* and respondents' *Cross-Petition for Permission to Appeal*.  Both the petition and the cross-petition were denied on November 13, 2017.

Appeal No. 18-8024. Tenth Circuit decision to reverse and remand dated December 13, 2019. See Cupps. v. Pioneer Canal-Lake Hattie Irrigation Dist., 799 F. App'x 571 (10th Cir. 2019). Petition for rehearing and rehearing en banc denied on April 10, 2020.

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Wyoming maintained subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331. This action arose under the laws of the United States, including the Act of March 3, 1891, §§ 18-22, 26 Stat. 1095, 1101-02 (1891) (formerly codified at 43 U.S.C. §§ 946-949).

Jurisdiction is proper in the United States Court of Appeals for the Tenth Circuit under 28 U.S.C. § 1291, in that this is an appeal of a final order of the United States District Court for the District of Wyoming. The final judgment under appeal was issued on November 17, 2021, and timely appealed by the Plaintiffs on December 2, 2021. The final judgment under appeal disposed of all claims and causes of action by and between the Plaintiffs and the Defendant.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred by disregarding the original survey of the boundary of the right-of-way for the Lake Hattie Reservoir, because it contained errors.

2.     Whether the district court erred in establishing a boundary of the right-of-way for the Lake Hattie Reservoir based solely upon the elevation of the reservoir's dam.

3.     Whether the district court erred by prioritizing factors in establishing a boundary of the right-of-way for the Lake Hattie Reservoir that were determined by the Tenth Circuit to be irrelevant.

4.     Whether the district court erred in disregarding the survey of the right-of-way boundary performed by the BLM.

5.     Whether the district court erred in concluding that the boundary of the right-of-way for the Lake Hattie Reservoir encompasses lands patented to the Appellants' predecessors-in-interest.

6.     Whether the district court erred in concluding that the boundary of the right-of-way for the Lake Hattie Reservoir includes an additional fifty feet along the marginal limits thereof.

## STATEMENT OF THE CASE

This matter involves the unauthorized encroachment of flood waters onto private lands located immediately adjacent to the Lake Hattie Reservoir in Albany County, Wyoming. The Pioneer Canal-Lake Hattie Irrigation District (the "Irrigation District") owns the

2

Lake Hattie Reservoir and all rights-of-way and water rights appurtenant thereto. However, a federal right-of-way defines the Irrigation District's rights in this case because the lands upon which the reservoir lie belong to the federal government and are administered by the United States Bureau of Land Management (the "BLM"). The underlying controversy concerns the scope of the Irrigation District's federal right-of-way and whether the right-of-way encompasses lands belonging to the Plaintiffs. The Plaintiffs contend that the scope of the reservoir right-of-way is limited to the boundaries submitted to and approved by the Department of the Interior in 1911; the Irrigation District, on the other hand, contends that the boundary of its right-of-way should extend to the physical limits of the reservoir.

The Plaintiffs' complaint was filed in the district court on April 28, 2016. See App. Vol. 1 at 12; see also App. Vol. 1 at 29-44. The Plaintiffs sought an order quieting title to each of their respective properties against the Irrigation District and an adjudication of damages resulting from the unauthorized flooding and storage of water on their respective properties since 2015.

A trial was held in 2018. See Cupps. v. Pioneer Canal-Lake Hattie Irrigation Dist., 799 F. App'x 571, 577-78 (10th Cir. 2019).

The district court concluded that the surveyed line on the approved map was not a fixed, permanent line, but rather a transitory line "that has moved and will continue to move over time." See id. at 578. Based on documents never submitted to, or approved by, the Department of the Interior, the district court established a highwater line elevation of 7,277 feet, plus an additional fifty feet for access and maintenance purposes. See id. The district court granted judgment on behalf of the Irrigation District and dismissed the Plaintiffs' claims in their entirety. See id.

On appeal, this Court reversed the judgment of the district court. See id. at 585. In finding the district court's reliance on elevation as the defining feature of the Irrigation District's right-of-way to be erroneous, this Court held that the Irrigation District's right-of-way was to be "determined by reference to the approved map." See id. "The Department [of the Interior] defined the Irrigation District's rights by reference to an approved map depicting a specific geographic area; consequently, other factors that arguably could be advanced as bearing on the scope of its rights — whether elevation or the practical infeasibility of using the right-of-way actually depicted on the map — are irrelevant." See id. at 582. This

4

Court remanded the matter to the district court for further consideration.

On remand, a trial was held on September 14, 2021 to determine the actual physical location of the Irrigation District's right-of-way boundary as depicted on the approved map. See App. Vol. 1 at 114. Despite overwhelming evidence to the contrary, the district court determined that the right-of-way boundary could not be located on the ground with any reliability or accuracy. See id. at 126-130, ¶¶ 18-25. Consequently, without referencing the approved map, the district court determined what it believed to be the *intended* location of the right-of-way boundary (*i.e.*, the elevation of the reservoir's dam). See id. at 129-130, ¶¶ 24-25. The district court established a highwater line elevation of 7,278 feet, plus an additional fifty feet for access and maintenance purposes. See id. at 140, ¶ 16. As before, the district court granted judgment on behalf of the Irrigation District and dismissed the Plaintiffs' claims in their entirety. See id. at 141, ¶¶ 18-19.

## STATEMENT OF FACTS

The underlying facts in this case are the same as those set forth in this Court's previous decision. See Cupps. v. Pioneer Canal-

5

Lake Hattie Irrigation Dist., 799 F. App'x 571, 573-76 (10th Cir. 2019).

In September 1909, the Irrigation District's predecessor-in-interest – the Lake Hattie Reservoir & Irrigation Company – submitted a surveyed map of the proposed boundaries of the Lake Hattie Reservoir to the Department of the Interior for approval under the Act of 1891. See App. Vol. 1 at 182-183; see also App. Vol. 1 at 116, ¶ 2. The surveyor, W.H. Rosecrans, certified on the face of the map, under oath, the following representation:

> The survey of the said reservoir and canals represent level lines, which are the *proposed water lines of the reservoirs* and the proposed grade lines of the canals, and that such surveys are accurately represented on the accompanying map and by the accompanying field notes and *no lake or lake bed . . . is used for said reservoirs and canals, except as shown on these maps*.

Id. (emphasis added); see also App. Vol. 1 at 116, ¶ 2.

Furthermore, the Irrigation District's predecessor-in-interest also certified on the face of the map, under oath, "that the surveys of the said Lake Hattie Reservoir and Canal are *correctly represented* on this map and by the accompanying field notes . . .. *as the definite location*" of said Lake Hattie Reservoir.  See id. (emphasis added); see also App. Vol. 1 at 116, ¶ 2. Moreover:

> This map has been prepared to be filed with the approval of the Secretary of the Interior in order that the Company may obtain the benefits of sections 18 to 21 inclusive of the Act of Congress, approved March 3, 1891, entitled an Act to repeal timber culture laws, and for other purposes, and section 2 of the Act approved May 11, 1898.

Id.; see also App. Vol. 1 at 117, ¶ 2.

> According to the field notes accompanying the map:

> In *running the line of the reservoir,* the distances were determined by stadia on a self-reading rod divided into feet and tenths, which served at the same time as a level rod to determine *the true water line.*

Id. at 168 (emphasis added); see also App. Vol. 1 at 117, ¶ 3.

On February 14, 1911, the Department of the Interior approved the map of the Lake Hattie Reservoir "under the provisions of the act of March 3, 1891 *as an application for an easement for a reservoir and right of way.*" See id. at 185 (emphasis added); see also App. Vol. 1 at 117, ¶ 4. Neither the map, the field notes, or the letter of approval from the Department of the Interior made any reference to a proposed or intended elevation of the water line of the reservoir. See id. at 117, ¶¶ 3-4.

In 1923, as proof of construction, the Irrigation District's predecessor-in-interest submitted the Affidavit of C.E. Fey, Treasurer and First Assistant Secretary of the Laramie Water Company, to the Department of the Interior. See id. at 188; see also

App. Vol. 1 at 118, ¶ 6. According to Mr. Fey, "the constructed Lake Hattie Reservoir . . . *conforms to the map and field notes which received the approval* of the Assistant Secretary of the Interior on the fourteenth day of February 1911." See id. (emphasis added); see also App. Vol. 1 at 118, ¶ 6. Mr. Fey further stated that "the company has in all things complied with the requirements of the act of Congress of March 3, 1891, and Section 2 of the Act of May 11, 1898." See id.; see also App. Vol. 1 at 118, ¶ 6.

Similarly, the civil engineer responsible for the final location surveys of the reservoir, Mr. Lyman E. Bishop, also submitted an affidavit in 1923 confirming the construction of the reservoir. See id. at 191; see also App. Vol. 1 at 119, ¶ 7. According to Mr. Bishop:

> The traverse of the *shore line* of Lake Hattie Reservoir *when filled to full capacity level is as given in the Field Notes* accompanying [the right-of-way application] and . . . that said Lake Hattie Reservoir *as constructed conforms to the map and accompanying field notes . . . which were approved* by the First Assistant Secretary of the Interior on February 14th, 1911.

Id. at 191-192 (emphasis added); see also App. Vol. 1 at 119, ¶ 7.

After submission of the affidavits, the Department of the Interior concluded that "the affidavits of the engineer, under whose supervision the project was constructed and the certificates of the president of the company, show that each of the above-mentioned

projects . . . have been constructed and completed exactly in conformity with the specifications." See id. at 196-197. No further maps of location regarding the Lake Hattie Reservoir were filed by either the Irrigation District, its predecessors-in-interest, or approved by the Department of the Interior, at any other time.

On August 27, 1951, under the Small Tract Act of June 1, 1938, the Department of the Interior issued Classification Order No. 10, which declared 47.53 acres "adjoining" Lake Hattie Reservoir to be chiefly valuable for home and cabin sites. See Classification Order No. 10, 16 Fed. Reg. 9288-89 (Sept. 13, 1951); see also App. Vol. 1 at 119-120, ¶ 8. Classification Order No. 10 subdivided the land immediately south of the reservoir right-of-way into fifty separate tracts. See id. The fifty tracts were plotted by a survey performed by the BLM in 1949-50. See id. In preparation for the survey, the local cadastral surveyor in Cheyenne, J.Q. Naret, was advised to "secure a copy of the traverse of the highwater line of Lake Hattie" and "copies of the field notes showing the bearings and distances along this right-of-way." See App. Vol. 1 at 200; see also App. Vol. 1 at 120, ¶ 8. The field notes from the 1909 survey were considered "essential" to perform the dependent resurvey. See id. at 201; see also App. Vol. 1 at 120, ¶ 9.

Special Instructions were issued for the 1949 survey of the subdivided parcels adjacent to the reservoir. See id. at 204. The Special Instructions stated the order in which the survey was to be conducted. See id. at 205. First, the surveyor was to resurvey the boundaries of Section 28. See id. Second, the surveyor was to "survey the boundaries of the south side of the reservoir right-of-way through Section 28 as described in the above record." See id. The "above record" meant "the map and field notes of the survey of this reservoir that was filed by the Lake Hattie Reservoir and Irrigation Company in the Director's Office." See id. Third, only after the boundary of the reservoir right-of-way was retraced, the surveyor was to survey the exterior boundary of the small tracts. See id.

The Special Instructions clearly stated that the northern boundaries of the tracts, facing the reservoir, were to be located "south of or above this right-of-way boundary." See id. Specifically, the boundary for the small tracts "should be kept at approximately ten feet vertical height above the present water level and should be kept a minimum of forty feet from the right of way boundary." See id. "This is to leave a passage way at least forty feet in width between the right-of-way boundary and the lots, and to keep the

10

lots above the high-water elevation of the reservoir." Id. Accordingly, preliminary to the survey, the surveyor specifically reestablished the boundary of the reservoir right-of-way "as shown on the Lake Hattie Reservoir and Irrigation Company map, certified to on September 14, 1909." See id. at 223 and 226. The retracement of the surveyed line shown on the 1909 map located some of the original monuments attributed to the 1909 survey. See id. at 219 (noting the "retracement of this right-of-way reveals some evidence of the original marking of this line."), 223 (noting the presence of old stakes driven firmly in the ground and old decayed stakes loose on the ground), and 224 (noting presence of old decayed surveyors stake loose on the ground); see also App. Vol. 1 at 121, ¶ 10; and App. Vol. 1 at 300.

Consequently, the approved survey "represents a retracement and reestablishment of portions of the section boundaries and the high-water line of the reservoir, designed to restore the corners in their original locations, and the subdivision of a portion of the section." See id. at 234-235; see also App. Vol. 1 at 121, ¶ 12. As confirmed by the field notes for the survey and the survey itself, each of the tracts were located "south of the reservoir right-of-way." See id. at 219 (field notes stating that "a line is established south of

11

the reservoir right-of-way approximately twenty feet above the present water line of the lake, on which the north end of the lots facing the lake are established."); see also App. Vol. 1 at 121-122, ¶ 12; and App. Vol. 1 at 234-235.[1] Afterwards, the Regional Administrator confirmed to the Director of the BLM that the surveyor "reestablished the reservoir boundary right-of-way line." See id. at 209. In addition, the Regional Chief of Engineering described the survey and subdivision of tracts adjacent to the reservoir as "satisfactory." See id. at 211. The official plat of the survey was accepted on June 13, 1950. See id. at 234-235.

Between 1959 and 1963, after construction of substantial improvements on each of the tracts, patents were issued by the United States to each of the Plaintiffs' predecessors-in-interest

---

[1] Notably, four lots numbered 51 (2.87 acres), 52 (2.65 acres), 53 (1.92 acres) and 54 (3.10 acres) were platted in-between the Lake Hattie Reservoir and the fifty tracts. These four lots were not available for lease but were reserved for public access to Lake Hattie Reservoir. See Classification Order No. 10, 16 Fed. Reg. at 9288 ("Lots numbered 51, 52, 53 and 54 of this same section are not available for lease but are reserved for public access."); see also App. Vol. 1 at 234-235.

based upon the 1949-50 BLM survey. <u>See</u> App. Vol. 2 at 19-27; <u>see also</u> App. Vol. 1 at 122, ¶ 13.[2]

In 1996, the BLM resurveyed the Lake Hattie Reservoir and the fifty small tracts to "identify Federal land boundaries within and adjacent to the Small Tract Surveys along the southern shore of Lake Hattie." <u>See</u> App. Vol. 1 at 237; <u>see also</u> App. Vol. 1 at 125, ¶ 16. This action was "considered an urgent management need to clear up existing occupancy trespass and maintain access to Lake Hattie for public recreation." <u>See</u> <u>id.</u> Preliminary to the survey, the lines of the previous surveys, including the 1949-50 survey, were retraced. <u>See</u> <u>id.</u> at 243; <u>see also</u> App. Vol. 1 at 244-246 ("Restoring the dependent resurvey executed by Thomas W. Crawford in 1949-50."). The resurvey, approved by the BLM on June 6, 1996, clearly confirmed that the right-of-way boundary did not lie upon, underneath, or overlap, any of the patents issued to the Plaintiffs' predecessors-in-interest. <u>See</u> <u>id.</u> at 270 (map explicitly identifying the "Lake Hattie Reservoir Boundary."). Furthermore, the resurvey

---

[2] Beginning in 1933, the Department of the Interior instructed each of its land offices to deny any application that conflicted with a right-of-way for a reservoir under the Act of 1891. <u>See</u> Instructions, Reservoir Rights of Way Under Act of March 3, 1891, Circular No. 1291, 54 Pub. Lands Dec. 141-42 (1933).

13

continued to locate and identify the four tracts of land to be used for public access lying in-between the Lake Hattie Reservoir and the fifty small tracts. See id.

## SUMMARY OF ARGUMENT

The purpose of this matter is to determine the scope and extent of the Irrigation District's reservoir right-of-way under the Act of 1891. In the prior appeal in this case, this Court held that the Irrigation District's right-of-way was to be determined solely by reference to the approved map – other factors beyond the approved map are irrelevant. Consequently, as before, the district court erred in awarding a right-of-way to the Irrigation District based on the elevation of the dam's spillway, rather than the line of survey set forth on the approved map. Despite this Court's clear mandate after the previous appeal in this case, the district court's decision after remand is virtually same as its decision before. The district court also erred in disregarding the resurvey of the right-of-way performed by the BLM. The BLM's survey relied on monuments from the original survey and is entitled to a presumption of validity.

Further, the district court erred in concluding that the boundary of the right-of-way includes an additional fifty feet along the marginal limits thereof. Here, there is nothing in the record of

14

this matter that the applicant necessarily required the additional fifty feet for the construction, maintenance, or care of the reservoir or that the Department of the Interior approved an additional fifty feet.

In accordance with the foregoing, the Plaintiffs respectfully request that the judgment of the district court be reversed in its entirety.

## ARGUMENT

**I.    STANDARD OF REVIEW ON APPEAL.**

This Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error. See <u>Benham v. Ozark Materials River Rock, LLC</u>, 885 F.3d 1267, 1274 (10th Cir. 2018). This Court may reverse if the district court's findings of fact are "without factual support in the record or if, after reviewing all the evidence, [the Court is] left with a definite and firm conviction that a mistake has been made." See <u>id.</u>, quoting <u>Aquila, Inc. v. C.W. Mining</u>, 545 F.3d 1258, 1263 (10th Cir. 2008). Under *de novo* review, the Court conducts an independent determination of the issues using the same standard employed by the district court. See <u>Olguin v. Lucero</u>, 87 F.3d 401, 403 (10th Cir. 1996).

**II.    THE DISTRICT COURT WAS NOT EMPOWERED TO RELOCATE THE RIGHT-OF-WAY'S BOUNDARY LINES IN ANY POSITION OTHER THAN THOSE ESTABLISHED BY THE ORIGINAL SURVEYOR.**

The original, approved map is the only consideration in locating the boundaries of a right-of-way under the Act of 1891.

Section 18 of the Act of 1891 provided, in pertinent part, as follows:

> The right of way through the public lands and reservations of the United States is hereby granted . . . *Provided*, that . . . all maps of location shall be subject to the approval of the department of the Government having jurisdiction of such reservation[.]

26 Stat. 1095, 1101-02 (formerly codified at 43 U.S.C. § 946).

Under Section 19:

> Any canal or ditch company desiring to secure the benefits of this act shall . . . file with the register of the land office for the district where such land is located a map of its canal or ditch and reservoir; and upon the approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office[.]

26 Stat. 1102 (formerly codified at 43 U.S.C. § 947). Section 18 does not confer any rights independently of Section 19, and the two statutory provisions "are to be construed together." See Union Land & Stock Co. v. United States, 257 F. 635, 639 (9th Cir. 1919). According to rules of construction in place then and today, statutory provisions such as these "granting privileges or relinquishing rights of the public are to be strictly construed." See

16

Caldwell v. United States, 250 U.S. 14, 20 (1919); and Wisconsin Cent. R. Co. v. United States, 164 U.S. 190, 202 (1896). "Nothing passes but what is conveyed in clear and explicit language." See Caldwell v. United States, 250 U.S. at 20.

In 1908, the Department of the Interior formally adopted regulations for rights-of-way for reservoirs under the Act of 1891. See Regulations for Rights of Way Over Public Lands and Reservations, 36 Pub. Lands Dec. 567 (1908). The 1908 regulations were in effect at the time the Defendant's predecessor-in-interest submitted its map to, and received its approval from, the Department of the Interior. The regulations demanded that any person or corporation "desiring to obtain the benefits of the law must file the papers and maps specified below with the register of the land district in which the canal, ditch, or reservoir is to be located." See id., at § 8, 36 Pub. Lands Dec. at 570. The maps and field notes "*should be so complete that from it the surveys could be accurately retraced* by a competent surveyor with proper instruments." See id., at § 10, 36 Pub. Lands Dec. at 572 (emphasis added). Importantly, "*the line of survey should be that of the actual location of the proposed ditch and, as exactly as possible, the water line of the proposed reservoir.*" See id. (emphasis added). After

17

construction of the reservoir, "no new map will be required, unless there are deviations from the right of way previously approved, either before or after construction, *when there must be filed* new maps and field notes in full . . . *changed to agree with the facts in the case*." See id., at § 23, 36 Pub. Lands Dec. at 575 (emphasis added).

"It must be remembered that mere occupation of the public lands gives no right as against the government." See Tarpey v. Madsen, 178 U.S. 215, 220-21 (1900). For example, according to the Supreme Court:

> We are of opinion that a proper interpretation of the acts of Congress making . . . grants like the one in question requires that the relative rights of the company and an individual entryman must be determined, not by the act of the company in itself fixing definitely the line of its [reservoir], or by the mere occupancy of the individual, but by record evidence, *on the part the filing of the map in the office of the Secretary of the Interior*[.] . . . In this way, matters resting on oral testimony are eliminated, a certainty and definiteness is given to the rights of each, *the grant becomes fixed and definite*.

Id. at 228-29 (emphasis added). By the filing of the map of the line surveyed, the route was fixed, within the intent and meaning of the Act. See Missouri, K. & T. Ry. Co. v. Cook, 163 U.S. 491, 496 (1896). The principal object in filing the map was to "definitely locate the line and limits of the right of way." See id.

18

In light of the foregoing principles, this Court held in the previous appeal in this case that the Irrigation District's right-of-way under the Act of 1891 is to be determined solely by reference to the map approved by the Department of the Interior in 1911. See Cupps. v. Pioneer Canal-Lake Hattie Irrigation Dist., 799 F. App'x 571, 585 (10th Cir. 2019). "*Other factors* that arguably could be advanced as bearing on the scope of its rights — whether elevation or the practical infeasibility of using the right-of-way actually depicted on the map — *are irrelevant.*" See id. at 582 (emphasis added). "Look[ing] beyond the approved map and accompanying field notes to other evidence," and "ultimately divining the right-of-way's boundaries by extrapolating from the originally intended high-water elevation level and the height of the reservoir's dam," is "erroneous." See id. at 579. Yet that is precisely what the Irrigation District proposed, and the district court ultimately did – look beyond the approved map and accompany field notes to other evidence to divine the right-of-way's boundaries.

### a. The district court erred by disregarding the approved survey of the right-of-way for the Lake Hattie Reservoir.

Both the letter and the spirit of this Court's mandate in this case make clear that the right-of-way's boundaries are to be

determined solely by reference to the approved map, and "*other factors*" that arguably could be advanced as bearing on the scope of the right-of-way (including elevation, the practical infeasibility of using the right-of-way, the intended high-water elevation level, and the height of the reservoir's dam) are "*irrelevant.*" See id. at 582 (emphasis added). Looking beyond the approved map to other evidence is "erroneous." See id. at 579. Despite the clear directions from this Court, on remand the district court disregarded the approved map because it contained errors, and instead relied on every factor that this Court explicitly determined to be irrelevant.

The district court found that the original map contained a misclosure and that the surveyed lines "showed dramatic variations in elevation" in 2021. See App. Vol. 1 at 126, ¶ 19.[3] Since the boundary lines were no longer at a level elevation *in 2021* – 110 years after the original survey – the district court determined that the approved map ignored the surveyor's "intent to represent a *level* line and disregards the reality of the 'third dimension' (vertical location or depth/elevation) which must necessarily be considered when establishing an easement to store water." See id. at 130, ¶ 24

---

[3] In surveying, a "misclosure" is a situation where the last in a series of linked traverse lines fails to join up exactly with the first.

(emphasis in original). According to the district court, acceptance of the approved map "would not allow Defendant to store any of its 1908 or 1986 water rights in Lake Hattie Reservoir[,] . . . making management of the reservoir difficult at best, impossible at worst." See id.

The district court continued: "these errors make the line depicted on [the] 1909 map, in itself, an *unreliable source* for determining the boundary of [the Irrigation District's] right-of-way easement for Lake Hattie Reservoir." See id. at 138, ¶ 10 (emphasis added). Accordingly, the district court literally looked beyond the approved map and accompanying field notes to other evidence, and set the right-of-way boundary to be the "high-water line of Lake Hattie Reservoir." See id. at 140, ¶ 14.[4]

The district court erred by disregarding the approved map in its entirety, finding it to be an "unreliable source." It is undisputed that the map prepared by W.H. Rosecrans contained errors,

---

[4] Even though this Court counseled against reliance on elevation or "divining the right-of-way's boundaries by extrapolating from the originally intended high-water elevation level," the district court did so anyway, stating that consideration of elevation and the high-water line is "entirely appropriate given the reservoir's intended use." See App. Vol. 1 at 140, ¶ 14.

including an error of closure. But these mistakes do not impeach the integrity of the survey as a whole.[5] According to the professional textbook *Evidence and Procedures for Boundary Location*, "every measurement, either horizontal or angular, has errors. *There are no perfect and absolute measurements.* Whether the measurement errors are caused by improper methods of surveying or are inherent in the instruments or caused by nature, errors are present." See Walter G. Robillard *et al.*, *Evidence and Procedures for Boundary Location* 157 (6th ed. 2011) (emphasis in original); see also App. Vol. 2 at 122 (testimony of Jeff Jones), and 252 (testimony of David

---

[5] The misclosure does not even affect any of the property at issue in this case. The Plaintiffs' properties are located in Section 28. See App. Vol. 1 at 234-235. However, the misclosure occurred in Section 26, more than a mile to the east. See App. Vol. 2 at 29. The district court noted that due to the type of equipment used, the original survey contained one foot of error for every 430 feet traversed; however, the district court did not identify any specific errors in either distances or courses in Section 28. See App. Vol. 1 at 127, ¶ 19.

Coffey).[6] Errors are a fact in every survey. See App. Vol. 2 at 114 (testimony of Jeff Jones).[7]

However, the presence of errors does not mean that Mr. Rosecrans' survey cannot be located on the ground. See id. at 115 (testimony of Jeff Jones), and 253 (testimony of David Coffey). "Absolute accuracy is not attainable. A degree of certainty that is reasonable as a practical matter, having regard to the circumstances, is all that is required." See State of Ark. v. State of Tenn., 269 U.S. 152, 157 (1925). In making a resurvey, the question is not where a modern, more accurate survey would locate

_____

[6] The Plaintiffs' expert surveyor, Jeffrey Jones, testified that this textbook is "used extensively by land surveyors" and "is one of the foundational textbooks or reference guides for all surveyors." See App. Vol. 2 at 119-120. Several courts have relied on this text as well. See Larsen v. Richardson, 260 P.3d 103, 114 n. 5 (Mont. 2011) (noting that this text "offer[s] helpful insights" and is "cited as persuasive authority."); and Town of Union v. Strong, 681 A.2d 14, 18 (Me. 1996) (citing text as authority for "common property surveying techniques.").

[7] Jeffrey Jones testified that older surveys may have errors in measurements that may be considered unacceptable by today's standards. This does not mean that older surveys are unreliable. See App. Vol. 1 at 164. It must also be considered that there is always the potential for typographical errors, i.e., a distance noted as 450 feet should have been 540 feet, 67 degrees was written as 76 degrees, or a northwest bearing should have been southwest. See id. A typographical error of this type would add to the mis-closure of a survey and make it look worse than it actually was. See id.

23

the boundary, but where did the original survey locate such boundary. <u>See</u> United States Bureau of Land Management, *Manual of Surveying Instructions* 283, § 349 (1947); <u>see</u> <u>also</u> App. Vol. 2 at 260 and 263-264 (testimony of David Coffey); and <u>Hagerman v. Thompson</u>, 235 P.2d 750, 759-60 (Wyo. 1951) (a resurvey may only "ascertain the lines of the original survey and the original boundaries . . . *as established and laid out by the survey*.") (emphasis added).[8]

"The original survey as it was actually run on the ground controls." <u>See</u> <u>United States v. Doyle</u>, 468 F.2d 633, 636 (10th Cir. 1972), <u>citing</u> <u>United States v. State Investment Co.</u>, 264 U.S. 206, 212 (1924). "It does not matter that the boundary was incorrect as originally established. A precisely accurate resurvey cannot defeat . . . the original grant and the boundaries originally marked off." <u>See</u> <u>id.</u>, <u>citing</u> <u>United States v. Lane</u>, 260 U.S. 662, 665-66 (1923). "The conclusiveness of an inaccurate original survey is not affected by the fact that it will set awry" the boundaries of a right-of-way. <u>See</u> <u>id.</u>

---

[8] This Court has recognized the Manual of Surveying Instructions (1947) as a proper statement of surveying principles. <u>See</u> <u>United States v. Doyle</u>, 468 F.2d 633, 637 (10th Cir. 1972).

"The lines, corners and monuments set by the creating surveyor, regardless of how imprecisely they were located, must remain fixed in place. No subsequent surveyor has the authority to 'correct' any errors that are found." See Walter G. Robillard & Donald A. Wilson, *Brown's Boundary Control and Legal Principles* 395 (7th ed. 2014); see also App. Vol. 2 at 247-248 (testimony of David Coffey).[9] "If land is to remain fixed in position and not altered by every resurvey, the principle must stand." See id.; see also App. Vol. 2 at 248 (testimony of David Coffey). "Later surveyors are not empowered to place the lines in any position other than those established by the original surveyor." See id.; see also App. Vol. 2 at 249 (testimony of David Coffey). The location of a boundary line is proven by retracing, as nearly as possible based upon existing evidence, the footsteps of the original surveyor whose survey fixed the boundaries, and it is immaterial if the lines actually run by the original surveyor are incorrect. See id.; see also App. Vol. 2 at 249 (testimony of David Coffey); and Galt v. Willingham, 11 F.2d 757,

_____

[9] Jeffrey Jones testified that this textbook was also a foundational textbook for surveyors. See App. Vol. 2 at 123-124; see also Larsen v. Richardson, 260 P.3d 103, 114 n. 5 (Mont. 2011) (together with the aforementioned text, considered to be one of the "bibles" of surveying).

758 (5th Cir. 1926). The surveyor's only duty is to relocate the courses and lines at the same place where originally located by the first surveyor on the ground. See id.; see also App. Vol. 2 at 249 (testimony of David Coffey); and 11 C.J.S. *Boundaries* § 7 ("There is a general rule in surveying of endeavoring to find the footsteps of the original surveyor and to try to harmonize the survey with previous field-note calls."). A resurvey that changes lines and distances and purports to correct inaccuracies or mistakes in an old plat is not competent evidence of the true line fixed by the original plat. See Cragin v. Powell, 128 U.S. 691 (1888).

Based on the foregoing principles, the district court erred by disregarding the approved survey of the right-of-way for the Lake Hattie Reservoir. A misclosure is not unusual, nor incapable of being harmonized to the survey as a whole. The surveying profession has evolved a variety of methodologies and principles for addressing errors in an original survey. See Nourachi v. United States, 655 F. Supp. 2d 1215, 1223 (M.D. Fla. 2009) (noting that the least squares method well is an "accepted surveying principle" to correct a misclosure); Craft v. Thompson, 405 So. 2d 128, 130 (Miss. 1981) ("the chancellor did not admit the survey into evidence erroneously even though the survey was not closed."); Brackett v.

Cleveland, 363 P.2d 1050, 1051 (Colo. 1961) (noting that the
compass rule adjustment is "standard" to balance discrepancies
between distances and courses); and Combs v. Valentine, 137 S.W.
1080, 1082 (Ky. 1911) (when the courses and distances called for in
a patent do not close the survey, the courses must be preserved and
the distances sacrificed in order to make the survey close).[10] The
district court gave no consideration to any of these methodologies
and instead, contrary to the prior opinion of this Court (*i.e.*, the
right-of-way's boundaries are to be determined solely by reference
to the approved map), chose to disregard the survey in its entirety.

If the approved map is so flawed and incapable of
reproduction, then perhaps the right-of-way should be nullified, as
opposed to relocating the boundaries in a manner never submitted
to nor approved by the Department of the Interior. See United
States v. Big Bend Transit Co., 42 F. Supp. 459, 470 (E.D. Wash.
1941) ("When the surveyor is mistaken as to the courses and
distances, the Court must reconcile the conflicting calls so as to

---

[10] See also *infra* at pages 38-39. The Irrigation District's
surveyor, David Coffey, used the compass rule adjustment to close
the original survey. Mr. Coffey testified that the compass rule
adjustment is a commonly used and accepted methodology for
overcoming errors in a survey.

establish the true location. . . . Of course, if the Russell survey was so grossly inaccurate and showed such careless disregard of engineering requirements as to prove lack of bona fides in defendant's 1914 application, then the foregoing rule would not save it.").[11]

### b. The district court erred by relying on factors that this Court explicitly determined to be irrelevant.

In addition to ignoring the original survey, all of the factors relied upon by the district court in relocating the right-of-way's boundaries were explicitly determined by this Court to be irrelevant, including reliance on elevation (see App. Vol. 1 at 124-125, 127-130, ¶¶ 15, 21, 24), infeasibility of using the right-of-way (see App. Vol. 1 at 130, 137, ¶¶ 24, 9), height of the reservoir's dam (see App. Vol. 1 at 128-129, 140, ¶¶ 22, 14), the originally intended high-water elevation level (see App. Vol. 1 at 127-129, ¶¶ 21, 22), and other evidence beyond the approved map and accompanying field notes (see App. Vol. 1 at 129-130, ¶ 24). See Cupps. v. Pioneer

---

[11] If the original right-of-way was nullified, the Irrigation District would not be without a remedy. The Irrigation District could apply for a new right-of-way under § 501(a) of the Federal Land Policy and Management Act, 43 U.S.C. § 1761(a).

Canal-Lake Hattie Irrigation Dist., 799 F. App'x at 579, 582 and 585.[12]

Further, the district court relied exclusively on the testimony of the Irrigation District's surveyor, David Coffey, to set the right-of-way boundary at the high-water line, the elevation of the spillway. See App. Vol. 1 at 140, ¶ 14.[13] Yet, Mr. Coffey's line of survey of the intended high-water line of the reservoir (Sheet 3), upon which the district court relied, is fatally flawed for one simple reason: Mr. Coffey's depiction of what he believed to be the *intended* location of

---

[12] The district court even appears to argue that this Court's prior decision was decided incorrectly. For example, the district court criticizes this Court's decision to ignore the practical infeasibility of using the right-of-way as actually depicted on the map, because doing so "disregards the purposes of the 1891 Act." See App. Vol. 1 at 137, ¶ 9.

[13] Mr. Coffey prepared four separate drawings, or sheets, that encompass his opinions in this case. See App. Vol. 2 at 29-32 and 178-179. Sheet 1 is his original resurvey of the right-of-way, without making any adjustments for the misclosure. See id. at 29 and 201. Sheet 2 is his resurvey making adjustments to close the survey. See id. at 30 and 213. Sheet 3 is where Mr. Coffey would locate the right-of-way based on the elevation of the spillway, alleged to be the original surveyor's presumed intent. See id. at 31 and 220. The red line on Sheet 3 represents the dead pool elevation of the reservoir, the blue line represents the spillway elevation, and the black line represents Mr. Coffey's resurvey making adjustments to close the survey from Sheet 2. See id. Sheet 4 is a depiction of the spillway and the Plaintiffs' properties in greater detail. See id. at 32 and 222.

the boundary line (Sheet 3) is admittedly not based on the original surveyor's map or field notes. <u>See</u> App. Vol. 2 at 239 (testimony of David Coffey); <u>see also id.</u> at 239-240 (testimony of David Coffey confirming that his depiction of the *intended* location is not the same as Mr. Rosecrans' *actual* location). There is no information in Mr. Rosecrans' field notes – including any line, course, distance, angle, or monument – that correspond to Mr. Coffey's depiction in Sheet 3. <u>See id.</u> at 242 (testimony of David Coffey). In fact, there are courses and angles in Mr. Rosecrans' field notes that are completely contrary to Mr. Coffey's depiction of the intended location (Sheet 3). <u>See id.</u> (testimony of David Coffey); <u>see also</u> App. Vol. 2 at 31 (compare Mr. Coffey's two lines at lots 10-11; Mr. Coffey's adjusted line angles to the north, while the spillway elevation angles to the south).

Mr. Coffey's depiction in Sheet 3 admittedly draws conclusions from facts not set forth in Mr. Rosecrans' field notes, notably the spillway's elevation. <u>See id.</u> at 241 (testimony of David Coffey).[14] Mr.

---

[14] As discussed in greater detail below, Mr. Coffey's Sheet 2 is a retracement of the original survey, with adjustments made to account for errors. <u>See</u> App. Vol. 2 at 30 and 213. In the upper lefthand corner of Sheet 2, under the heading "Rosecrans line surveyors notes," notation number six states that "the Rosecrans survey line in this drawing was drawn per record field notes." <u>See</u>

Coffey could not identify a line "relatively level with the spillway's physical location" without considering the elevation of the spillway itself. See id. (testimony of David Coffey). The spillway's physical location has no independent significance unless its elevation is taken into consideration. See id. (testimony of David Coffey).[15] Thus, Mr. Coffey performed the very exercise that was forbidden by this Court: looking beyond the approved map and accompanying field notes to other evidence and ultimately divining the right-of-way's boundaries by extrapolating from the originally intended high-water elevation level and the height of the reservoir's dam.

Significantly, Mr. Coffey concedes that his depiction of the intended location of Mr. Rosecrans' line of survey (Sheet 3) does not put the courses and lines at the same place where originally located

_____

id. at 30 and 240. However, Mr. Coffey's Sheet 3, which was adopted by the district court, under the heading "survey notes," does not include any reference or statement that the survey is based on the record filed notes. See id. at 31. In fact, Mr. Coffey conceded that it was not. See id. at 240. Notation number six on Sheet 3 states that the blue contour line represents the spillway elevation of 7,278 feet. See id. at 31.

[15] On Mr. Coffey's Sheet 3, the blue line (representing the spillway elevation of 7,278 feet) and the black line (representing the original approved right-of-way) are one and the same in the location of the dam and spillway. See App. Vol. 2 at 31 and 240-241. Thus, the physical location of the spillway is entirely inconsequential.

31

by Mr. Rosecrans on the ground. See id. at 249-250 (testimony of David Coffey). Mr. Coffey's depiction of the intended location "materially changes" the configuration of Mr. Rosecrans' survey and moves the lines to an entirely new location.  See id. at 263 (testimony of David Coffey).

Mr. Coffey *conceded* at trial that a right-of-way at an elevation of 7,278 feet (Sheet 3) is not based on Mr. Rosecrans' map or field notes and is inconsistent with the approved map.

Q.   Your depiction of what you believe to the intended location of Mr. Rosecrans' line, your sheet 3, is not based on his record field notes, is it?

A.   That's correct.

\*      \*      \*

Q.   In fact, sheet 3 contains both your adjustment of Mr. Rosecrans' line and your depiction of what you believe he intended, right?

A.   Correct.

Q.   So, they're not one and the same, are they?

A.   No, they're not.

\*      \*      \*

Q.   There are no lines in Mr. Rosecrans' field notes that correspond to an elevation of 7,278 feet, are there?

A.   That is correct.

        *     *     *

Q.   Your depiction of what you believe to be the intended location of Mr. Rosecrans' line, your sheet 3, does not relocate the courses and lines at the same place where originally located by Mr. Rosecrans on the ground, does it?

A.   No, it does not.

See id. at 239, 240, 242 and 249-250 (testimony of David Coffey).

Consequently, the decision of the district court to disregard the original map and rely instead on a presumed intended location, which in itself is entirely inconsistent with the original map, was erroneous. Despite its misgivings concerning the accuracy of the approved map, the district court was not empowered to locate the right-of-way's boundary lines in any position other than those established by the original surveyor, regardless of how imprecisely they may have been located.

**c.   The district court erred in disregarding the survey of the right-of-way boundary performed by the BLM**.

In 1949-50, in preparation for leasing land near the reservoir under the Small Tract Act, the BLM performed a resurvey of the boundaries of the right-of-way for the Lake Hattie Reservoir. See App. Vol. 1 at 214-235. According to field notes from the resurvey, surveyors used the 1909 map as a reference point and located at

least twelve old surveyor's stakes remaining from the original survey. See id. at 155 and 300. The field notes specifically stated that "the retracement of this right of way reveals some evidence of the original markings of this line." See id. at 219. The surveyor's stakes recovered by the BLM in 1949-50 coincide with Mr. Rosecrans' written description of the boundary of the right-of-way. See App. Vol. 2 at 64 (testimony of Jeff Jones) and 261-262 (testimony of David Coffey).

Evidence of the original markings of the boundary line, such as monuments or surveyor's stakes, represent the true location of the lines as run by the original surveyor. See id. at 62 (testimony of Jeff Jones) and 261 (testimony of David Coffey); see also Silver King Coalition Mines Co. v. Conkling Mining Co., 255 U.S. 151, 162 (1921) (stating that monuments "controlled the courses and distances in the instrument evidencing the grant.").[16] There is no

---

[16] According to this Court, "the general order of precedence of proofs for determining disputed boundaries gathered from the multitude of adjudicated cases is: First, natural monuments or objects, like mountains, lakes, and streams; second, artificial marks, stakes, or other objects, made or placed by the hand of man, as in this case; third, courses and distances in documents or writings prescribing or reporting the establishment of the lines; lastly, recitals of quantity." See United States v. Redondo Development Co., 254 F. 656, 658 (8th Cir. 1918).

retracement principle that permits a retracing surveyor to disregard found original evidence. <u>See</u> Walter G. Robillard *et al.*, *Evidence and Procedures for Boundary Location* 79 (6th ed. 2011); <u>see</u> <u>also</u> App. Vol. 2 at 121 (testimony of Jeff Jones).

Accordingly, the BLM's field notes provide a detail description of the recovered stakes, discussed the differences in bearings and distances, and clearly show that the BLM carefully considered, analyzed, and accepted these as original monuments placed to define the reservoir's right-of-way as described by Mr. Rosecrans. <u>See</u> App. Vol. 1 at 156 (testimony of Jeff Jones). Importantly, the recovered stakes were located at precise angle corners that correspond to the original survey. <u>See</u> App. Vol. 2 at 261-262 (testimony of David Coffey). This crucial fact was never mentioned or acknowledged by the district court.

Further, the BLM's adjustments to the surveyed boundary – to account for errors made by Mr. Rosecrans – generally align with Mr. Rosecrans' map. For example, as the right-of-way crosses the eastern boundary of Section 28, Mr. Rosecrans measured the distance to the southeast corner of Section 28 to be 710 feet. <u>See</u> App. Vol. 1 at 169. In 1949, the BLM measured this same distance to be 10.756 chains. <u>See</u> <u>id.</u> at 220. A "chain" is a unit of

measurement used by surveyors that is equal to sixty-six (66) feet. See id. at 157 (testimony of Jeff Jones). Thus, 710 feet is equal to 10.757 chains. See id. In this location, the BLM found a decayed stake in an old, buried mound of stone. See id. at 220.

Similarly, as the right-of-way crosses the western boundary of Section 28, Mr. Rosecrans measured the distance to the southwest corner of Section 28 to be 1,460 feet. See id. at 169. That distance (1,460 feet) is equal to 22.121 chains. See id. at 157 (testimony of Jeff Jones). In 1949, the BLM located the boundary of the reservoir as it crossed the western boundary of Section 28 to be exactly 22.121 chains from the section corner. See id. at 223.

Clearly, the BLM made every effort to retrace Mr. Rosecrans' survey as precisely as possible. See id. at 157 (testimony of Jeff Jones). The BLM measured precise distances from the section's two corners and even located a meaningful monument (a decayed stake in an old, buried mound of stone) along the eastern boundary of the section. In between the eastern and western boundaries of Section 28, the BLM identified at least eleven other surveyor's stakes they attributed to Mr. Rosecrans at specific angle locations. See id. at 300. The number and specific location of the surveyor's stakes attributed to Mr. Rosecrans cannot be ignored and constitute

36

compelling evidence of the location of the boundary line of the
Irrigation District's right-of-way.[17]

Consequently, the line resurveyed by the BLM in 1949-50 can
be found, located, and retraced on the ground today with sufficient
reliability. See App. Vol. 1 at 158 (testimony of Jeff Jones); see also
App. Vol. 2 at 263 (testimony of David Coffey). According to Jeffrey
Jones, a licensed surveyor with more than thirty years of
professional surveying experience, the BLM's resurvey of the

---

[17] "It is clear that the monuments must govern." See Higueras
v. United States, 72 U.S. 827, 835 (1864).

> Measurements of distances and the direction of lines in
> reference to the points of the compass mentioned in a
> deed, may be made a part of the description of the
> premises intended to be granted[.] . . . But ordinarily
> surveys are so loosely made, and so liable to be
> inaccurate, especially when made in rough or uneven
> land or forests, that the courses and distances given in
> the instrument are regarded as more or less uncertain,
> and *always give place, in questions of doubt or
> discrepancy, to known monuments* and
> boundaries referred to as identifying the land. Such
> monuments may be either natural or artificial objects,
> such as rivers, streams, springs, *stakes*, marked trees,
> fences, or buildings.

Id. at 835-36 (emphasis added).

boundary right-of-way for the Lake Hattie Reservoir is an accurate retracement. See id. at 153 (testimony of Jeff Jones).

Moreover, the accuracy of the BLM's retracement was confirmed by the Irrigation District's surveyor, David Coffey. Mr. Coffey attempted to retrace Mr. Rosecrans' line of survey by using the "compass rule" to adjust the survey to account for Mr. Rosecrans' errors and close the line of survey. See id. at 162 (testimony of Jeff Jones); see also App. Vol. 2 at 30, 64-65 (testimony of Jeff Jones), and 254-257 (testimony of David Coffey). The "compass rule" is commonly used, simple, repeatable, and universally accepted for use with modern equipment. See id.; see also App. Vol. 2 at 255 (testimony of David Coffey). Mr. Coffey's adjustments to Mr. Rosecrans' line of survey (Sheet 2), using the "compass rule," were reasonable. See App. Vol. 2 at 65 (testimony of Jeff Jones) and 256 (testimony of David Coffey). Not only did Mr. Coffey's adjustments close the line of survey, but he confirmed a "close correlation" between the physical location of the spillway and Mr. Rosecrans' line of survey. See id. at 256 (testimony of David Coffey). Moreover, many of the bearings and distances identified by Mr. Coffey are nearly identical to those laid out by Mr. Rosecrans. Compare App. Vol. 1 at 169 (1909 field notes; lines 24-25 to 42-43)

38

to App. Vol. 2 at 30 (Coffey's Sheet 2; table on bottom of page; lines 27-46).

Ultimately, Mr. Coffey's compass-adjusted line of survey (Sheet 2) lies in relatively close proximity to the BLM's 1949-50 retracement. See App. Vol. 2 at 256 (testimony of David Coffey); see also App. Vol. 2 at 6-17 (comparison of surveys), and 66 (testimony of Jeff Jones). Mr. Coffey's adjusted survey (Sheet 2) proves that the BLM's resurvey conforms to Mr. Rosecrans' original line of survey and can be located on the ground. See App. Vol. 1 at 165 (testimony of Jeff Jones). Even though Mr. Coffey's adjusted survey (Sheet 2) is not exact to the BLM's 1949-50 retracement, the two surveys consistently agree to a general location of the boundary for the right-of-way. See App. Vol. 2 at 256 (testimony of David Coffey); see also App. Vol. 2 at 6-17 (comparison of surveys), and 66 (testimony of Jeff Jones). So close are the three surveys (*i.e.*, the original 1909 survey, the BLM's 1949 resurvey and Mr. Coffey's 2021 resurvey) that their accuracy can be assumed within some reasonable distance and places the right-of-way somewhere near where it really exists.[18]

---

[18]  Again, as stated above, "absolute accuracy is not attainable. A degree of certainty that is reasonable as a practical

Despite locating Mr. Rosecrans' line of survey using modern, commonly accepted methodologies, Mr. Coffey claims that his resurvey (Sheet 2) is unreliable solely because the line – based on today's elevations – is not level. See id. at 242-243 (testimony of David Coffey). However, whether or not Mr. Coffey's resurvey is "reliable" should have nothing to do with elevation for two reasons. First, Mr. Rosecrans' original map makes no mention of elevation and is simply a two-dimensional outline of the boundaries of the reservoir. See id. at 241 (testimony of David Coffey). Second, the topography, including ground elevation, may have changed significantly since 1909 due to weather and erosion. See App. Vol. 1 at 279-298 (testimony of Braeden Hyde); see also App. Vol. 2 at 243 (testimony of David Coffey). Consequently, since the modern-day elevation of Mr. Coffey's line of survey is irrelevant, Mr. Coffey's adjusted survey (Sheet 2) constitutes a reasonable and accurate resurvey of Mr. Rosecrans' line of survey. Mr. Coffey offers no other reason why his adjusted survey (Sheet 2) would be unreliable or defective.

---

matter, having regard to the circumstances, is all this is required." See State of Ark. v. State of Tenn., 269 U.S. 152, 157 (1925). The degree of accuracy insisted on by the Irrigation District to locate its own right-of-way is not reasonable or practicable.

Nevertheless, since Mr. Coffey alleges that his adjusted survey (Sheet 2) is unreliable, he claims instead that Mr. Rosecrans *intended* to lay out a line that is "relatively level with the spillway's physical location." Mr. Coffey's reliance on Mr. Rosecrans' alleged *intent* is mistaken for a variety of reasons.

The original lines as run by the original surveyors are the best indicators of intent. <u>See</u> Walter G. Robillard & Donald A. Wilson, *Brown's Boundary Control and Legal Principles* 291 (7th ed. 2014); <u>see</u> <u>also</u> App. Vol. 2 at 245 (testimony of David Coffey). It is axiomatic that because a resurvey depends on the original survey described by the plats and field notes, the surveyor who undertakes a resurvey must base the resurvey on the original notes and plats by which the descriptions were created. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> App. Vol. 2 at 245 (testimony of David Coffey). The evidence of intent of any survey is to be interpreted from the map of the survey, the field notes of the survey, and the acts of the surveyor, not from the unwritten, unexpressed intent of the surveyor. <u>See</u> Walter G. Robillard *et al.*, *Evidence and Procedures for Boundary Location* 94 (6th ed. 2011); <u>see</u> <u>also</u> App. Vol. 2 at 250 (testimony of David Coffey).

A survey cannot be interpreted in light of any secret or hidden intentions of the creating surveyor; what the surveyor did and what he or she recorded in the evidence of writings are what count. See App. Vol. 2 at 250-251 (testimony of David Coffey). Later surveyors are not empowered to place the lines in any position other than those established by the original surveyor. See id. at 249 (testimony of David Coffey). Parties cannot be bound by any resurvey not based upon the survey as originally made. See Hagerman v. Thompson, 235 P.2d at 759-60.

Therefore, the district court failed to give proper consideration to the BLM's resurvey. Subsequent to its resurvey, the BLM issued Classification Order No. 10, which made the lands available for leasing to the general public. Despite the government's announcement that it surveyed the boundaries of the reservoir and subdivided the lands immediately adjacent thereto, the Irrigation District' predecessor-in-interest failed to investigate the matter further or challenge the BLM's resurvey of the boundaries of the right-of-way. It is well established that the publication of an item in the Federal Register constitutes constructive notice of anything within that item. See 44 U.S.C. § 1507 (stating that the filing of a document in the Federal Register "is sufficient to give notice of the

contents of the document to a person subject to or affected by it.");

see also Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947)

("Just as everyone is charged with knowledge of the United States

Statutes at Large, Congress has provided that the appearance of

rules and regulations in the Federal Register gives legal notice of

their contents.").

Moreover, a survey made by the proper officers of the United

States, and confirmed by the land department, is not open to

challenge by any collateral attack in the courts. See Russell v.

Maxwell Land-Grant Co., 158 U.S. 253, 256 (1895).[19] The BLM's

survey is entitled to a presumption of validity, and federal agencies

generally receive deference on matters within their special area of

expertise. See WildEarth Guardians v. United States Bureau of

---

[19] A survey made by the government must be held conclusive against any collateral attack in controversies between individuals. See Russell v. Maxwell Land-Grant Co., 158 U.S. 253, 258 (1895). "There must be some tribunal to which final jurisdiction is given in respect to the matter of surveys, and no other tribunal is so competent to deal with the matter as the land department." See id.

> If, in every controversy between neighbors, the accuracy of a survey made by the government was open to question, *interminable confusion would ensue.*

See id. (emphasis added).

Land Mgmt., 870 F.3d 1222, 1238 (10th Cir. 2017); and Sorenson

Communications, Inc. v. FCC, 567 F.3d 1215, 1221 (10th Cir. 2009).

Thus, although both the Irrigation District and the district
court criticize the BLM for not taking elevation into consideration, it
was not the job of the BLM look beyond the approved map to divine
the right-of-way's boundaries. Rather, the BLM focused exclusively
on the approved map, relying on numerous monuments located on
site, to determine the boundaries of the right-of-way. The BLM's
survey of the right-of-way is exactly in harmony with this Court's
decision in this case – seventy years before the matter was decided.

Consequently, the Irrigation District and its predecessors have
had constructive notice of the size, scope, and boundary of its own
right-of-way – and its relationship to the Plaintiffs' properties – for
more than seventy years and should not now be permitted to
question, challenge, or dispute the reliability of the BLM's resurvey.

### d. The district court erred in establishing the boundary of the right-of-way for the Lake Hattie Reservoir based upon the elevation of the reservoir's dam.

The district court concluded that right-of-way for the Lake
Hattie Reservoir is "as depicted by the blue line show in Defendant's
Exhibit D-3, Sheet 3 and Sheet 4, and further extends to the
statutorily mandated fifty feet horizontally therefrom." See App. Vol.

44

1 at 140, ¶ 16. However, the blue lines on Sheet 3 cannot reasonably be considered proper guidelines for the right-of-way because the blue lines merely show every line where the elevation is the same as the spillway, or 7,278 feet. Rather than establishing a right-of-way that can be ascertained with certainty, the decision by the district court simply raises more questions as to the location of the right-of-way.

First, aside from the arguments above as to the irrelevance of elevation to establish the location of the right-of-way, the decision of the district court creates ambiguity as it establishes the right-of-way at all locations at the elevation of 7,278 feet – including areas that are not adjacent to the reservoir. Incongruously, the plain language of the district court's decision would seemingly grant a right-of-way to the Irrigation District not only across the north boundary of the Plaintiffs' properties which face the reservoir, but also across the southern boundary of several of those properties as well. See App. Vol. 2 at 31 (identifying an "island" of land, circled in blue, behind several of the Plaintiffs' properties). Thus, in addition to improperly expanding the footprint of the reservoir by relying on the supposed high-water line, the district court's decision also creates uncertainty as to the location of the right-of-way that was

45

undeniably not intended to be included within the reservoir under the approved map.

Second, unlike the original survey, the BLM's resurvey, and Mr. Coffey's retracement of the original survey, the blue line on Sheet 3 has no metes and bound description and relies entirely upon the elevation of the lands around the reservoir as they exist today. The district court awarded the Irrigation District a right-of-way at the elevation of 7,278 feet *plus an additional fifty feet.* As the water level rises and lowers and whips across the landscape from the prevailing winds, it cannot be denied that the topographic features and physical layout of the reservoir have been and will continue to be altered by erosion. See App. Vol. 1 at 124, 130, ¶¶ 14, 24.[20] Therefore, in defiance of this Court's decision, the right-of-way adopted by the district court will be forever transitory with no

---

[20] According to the district court, "Lake Hattie Reservoir is located . . . in an area known for high winds on a year-around basis. As a result . . . the physical boundaries of Lake Hattie Reservoir constantly changed due to erosion, wave action and accretion and reliction of the lake boundary." See App. Vol. 1 at 124, ¶14, fn. 15. "Moreover, the elevations of a two-dimensional line of the reservoir easement will undoubtedly fluctuate over time due to ongoing erosion, accretion and reliction." See id. at 130, ¶ 24.

regard for what was originally approved.[21] Such a result defeats the very purpose of submitting a map and establishing a definitive boundary.

Finally, the right-of-way adopted by the district court will inherently lead to the *interminable confusion* alluded to in <u>Russell v. Maxwell Land-Grant Co.</u>, 158 U.S. at 258. The blue line on Mr. Coffey's Sheet 3 will ultimately impact an unknown number of other owners surrounding the reservoir where the blue line exceeds the original right-of-way established in the approved map. Disregarding the right-of-way as established in the approved map in favor of reliance on the spillway elevation may very well result in a rippling effect of litigation over property line disputes.

**e. This Court should not be persuaded that a right-of-way based on the original map would ignore the practical infeasibility of using the Irrigation District's water rights**.

The district court states on more than one occasion that acceptance of the approved map would not allow the Irrigation District to store any of its water rights. <u>See</u> App. Vol. 1 at 130, 137,

---

[21] According to this Court, "it is clear, moreover, that the Secretary here approved of a line fixed to the original topography because the map does not in any way indicate that the line is transitory." <u>See</u> <u>Cupps. v. Pioneer Canal-Lake Hattie Irrigation Dist.</u>, 799 F. App'x at 581.

¶¶ 24, 9. The evidence, however, suggests that prior to the platting of the Plaintiffs' properties in 1949-50, the Irrigation District' predecessors-in-interest were well aware of the scope of its right-of-way, and yet, never complained or objected that its scope was insufficient to store the entirety of its water rights. Stated another way, the construction of the reservoir is consistent with the boundary established by the original map.

For example, in 1923, after construction of the reservoir, Lyman E. Bishop, a civil engineer who surveyed the reservoir and supervised its construction, stated *under oath* "that the traverse of the shoreline of [the reservoir] when filled to full capacity level is as given in the field notes accompanying [the application] . . .  and that [the reservoir] as constructed conforms to the map and accompanying field notes." See id. at 119, ¶ 7. Mr. Bishop voiced no concern or objection at that time that the reservoir was not large enough to accommodate all of the Irrigation District's water rights.

Further, in 1951, after a survey and platting of the lands adjacent to the reservoir, the BLM issued Classification Order No. 10, which made the lands available for leasing to the general public. See 16 Fed. Reg. 9288. The Order itself acknowledged that the Irrigation District's predecessor-in-interest was not filling the

48

reservoir to an elevation of 7,278 feet, stating instead that "the water level of Lake Hattie fluctuates between elevations of 7,250 and 7,257 feet above sea level." See id.[22]

There is no truth to the concern that if the right-of-way is based on the approved map, the Irrigation District will be unable to use any of its water rights. In fact, the Irrigation District used its water rights for at least fifty years, prior to the platting of the Plaintiffs' lands, and an additional sixty-five years before the commencement of this litigation.

   **f.    Conclusion**.

After reviewing all the evidence, there is a definite and firm conviction that a mistake has been made by the district court. The district court should not have considered the Irrigation District's alleged infeasibility of using the right-of-way, the scope of the Irrigation District's water rights, or the height of the reservoir's dam. Similarly, the district court should not have balanced any equitable factors or weighed the potential implications to the Irrigation District. The only relevant consideration whatsoever is the

---

[22]  The Plaintiffs' expert, Jeff Jones, testified in the original trial that he estimated the elevation of the boundary of the Irrigation District's right-of-way to be 7,258 feet. See App. Vol. 1 at 125, ¶ 17.

approved map. The BLM's 1949-50 resurvey of the original map is substantially consistent with the original map, can be located on the ground by any competent surveyor, and protects the rights of all parties as they have existed for the past seventy years.

Incredulously, the Irrigation District contends that it should be awarded a right-of-way of its own choosing, because the right-of-way specifically sought from and approved by the Department of the Interior in 1911 is no longer sufficient to meet its needs. It is immaterial and of no consequence whether Mr. Rosecrans intended to establish a high-water line, a boundary line, a level line, a specific elevation, all of them, or none of them. The line surveyed by Mr. Rosecrans on the approved map is just that: the location of a boundary line on the ground. It is tied to the surface of the earth. It does not move, shift, or change for any reason. It is what it is. Even assuming Mr. Rosecrans made errors in the survey of that line, or the surveyed line does not, as alleged by the Irrigation District, show the correct high-water line for the reservoir, it is not our job to determine where the surveyed line should have been located, but rather to determine where it was actually located. See Cupps v. Pioneer Canal-Lake Hattie Irrigation Dist., 799 F. App'x at 581 (stating that the "extent of the ground occupied by the water of a

50

reservoir, for which a right of way has been granted under [the Act],
must be determined from the high-water line, *as shown by the
approved map*."); see also United States v. Doyle, 468 F.2d at 636
(stating that "the original survey as it was actually run on the
ground controls. . . . It does not matter that the boundary may have
been incorrect as originally established."). Even if Mr. Rosecrans
intended something different, there is no professional standard of
practice that would permit Mr. Rosecrans' alleged or presumed
intent to overcome, prevail over, or outweigh the lines established
on the approved map.

The professional surveying standards, as confirmed by case
law, overwhelmingly stand for the proposition that the lines,
corners, and monuments set by the creating surveyor, regardless of
how imprecisely they were located, must remain fixed in place. No
subsequent surveyor has the authority to "correct" any errors that
are found. Later surveyors are not empowered to place the lines in
any position other than those established by the original surveyor.
The entire foundation for the stability of the land depends on this
rule. "The conclusiveness of an inaccurate original survey is not
affected by the fact that it will set awry" the tracts to be surveyed.
See United States v. Doyle, 468 F.2d at 636.

51

Consequently, this Court should refrain from attempting to redraw the Irrigation District's right-of-way based on Mr. Rosecrans' presumed or alleged intent. The Irrigation District is obviously looking to other evidence, beyond the approved map and accompanying field notes, to divine the right-of-way's boundaries. If Mr. Rosecrans' intent is to be discerned only from his map of the survey, his field notes, and his monuments, then his intent does not correspond to a modern-day elevation of 7,278 feet. The boundary of the Defendant's right-of-way, as surveyed and located by Mr. Rosecrans in 1909, can be located on the ground, has been located on the ground, and was corroborated by two unrelated surveyors working independently of one another and seventy years apart (*i.e.*, the BLM in 1949 and David Coffey in 2021). The BLM's 1949-50 resurvey of the original map is substantially consistent with the original map. This conclusion was confirmed by the Irrigation District's own expert surveyor at trial.

The Irrigation District offers a variety of arguments and opinions to support its contention that this Court should *ignore* the original map and field notes – which were submitted to and approved by the Department of the Interior – and *instead* grant to the Irrigation District a right-of-way *never* before surveyed, *never*

submitted to or approved by the Department of the Interior, and *never* marked upon the official township plats by the General Land Office. The Irrigation District's plea to the Court to grant a right-of-way consistent with an elevation of 7,278 feet is dismissive of both the facts and the law applicable to the underlying matter.

Additionally, the evidence does not support a finding that the original map and field notes corresponds to the elevation requested by the Irrigation District. Rather, the evidence at trial proved that the scope of the Irrigation District's right-of-way is something considerably less than what it seeks today. The Irrigation District is attempting to remake its right-of-way – and expand the boundaries adopted by the original surveyor – 110 years after the fact. However, the fundamental underlying flaw in the Irrigation District's argument is that the right-of-way it seeks did not vest where it was never approved by the Department of the Interior. The BLM's 1949-50 resurvey of the boundary of the right-of-way confirms, substantiates, and proves that the right-of-way does not conflict with, or overlie, any property belonging to any of the Plaintiffs. No right-of-way may be acquired on the public lands of the United States except that which was expressly approved by the Department of the Interior and no deviation from the location of an approved

right-of-way shall be effective without the prior written approval of the federal government.

III.   **THE DISTRICT COURT ERRED IN CONCLUDING THAT THE BOUNDARY OF THE RIGHT-OF-WAY INCLUDES AN ADDITIONAL FIFTY FEET ALONG THE MARGINAL LIMITS THEREOF.**

The Defendant is not entitled to an additional fifty feet beyond the surveyed right-of-way boundary. Section 18 of the Act of 1891 provides for a right-of-way to the extent of the ground occupied by the water of the reservoir and fifty feet on each side of the marginal limits thereof, "*Provided*, That . . . all maps of location shall be subject to the approval of the department of the Government having jurisdiction of such reservation." See Act of March 3, 1891, at § 18, 26 Stat. 1101-02 (formerly codified at 43 U.S.C. § 946) (emphasis in original). Section 21 provides that the grant of a right-of-way for a reservoir does not necessarily carry with it a right to the use of land fifty feet on each side, but only such land may be used as is "necessary for the construction, maintenance, and care" of the reservoir. See id., at § 21, 26 Stat. 1102 (formerly codified at 43 U.S.C. § 949). According to the regulations, "the width [of an additional easement for construction, maintenance and care] is not specified." See Regulations for Rights of Way over Public Lands and Reservations, 36 Pub. Lands Dec. 567, 569 ¶ 4 (1908).

54

Neither the map, the field notes, or the letter of approval from the Department of the Interior made any reference to an additional fifty feet. This Court rejected the Irrigation District's argument that its right-of-way is defined by "the extent of the ground occupied by the water of the reservoir," because the Act of 1891 also provides that the right-of-way is subject to the government's approval of a map of the location of the reservoir. See Cupps v. Pioneer Canal-Lake Hattie Irrigation Dist., 799 F. App'x at 585. Importantly, reference to an additional fifty feet in the Act of 1891 is made in the *exact same sentence* as reference to "the extent of the ground occupied by the water of the reservoir." See 43 U.S.C. § 946.

Consequently, if "the extent of the ground occupied by the water of the reservoir" is subject to the government's approval of a map, so must be the additional fifty feet. See Windsor Reservoir and Canal Company v. Miller, 51 Pub. Lands Dec. 27, 33 (1925) ("It may be established by evidence that the grant includes fifty feet outward from the marginal limits of the reservoir."); see also 43 U.S.C. § 946 (providing for "additional rights of way as the Secretary of the Interior may deem necessary for the proper operation and maintenance of said reservoirs . . . upon the presentation of satisfactory showing by the applicant."). This rationale is consistent

with Court's decision that the right-of-way must be determined by reference to the approved map.

Moreover, there is nothing in the written record of this matter that the applicant necessarily required the additional fifty feet for the construction, maintenance, or care of the reservoir. Other than the location of the dam, the boundary of the reservoir is confined entirely to the natural ground shore. Additional access for construction, maintenance, or care is not necessary, as no construction, maintenance, or care would occur anywhere other than the dam. Therefore, the boundary of the right-of-way does not include an additional fifty feet.

## CONCLUSION

In accordance with the foregoing, the Plaintiffs respectfully request that the judgment of the district court be reversed in its entirety. Matters that have been decided, explicitly or implicitly, become law of the case. See Wilmer v. Board of County Commissioners of Leavenworth County, 69 F.3d 406, 409 (10th Cir. 1995). The issues in question concerning the scope and extent of a right-of-way under the Act of 1891 were explicitly decided by this Court. The district court's responsibility was to effectuate the mandate, not relitigate issues that were previously decided. The

scope and boundary of the federal right-of-way for the Lake Hattie Reservoir is as set forth on the approved map. The Irrigation District is not entitled to a right-of-way which deviates from, or is inconsistent with, that which was approved. Further, the district court erred in concluding that the boundary of the right-of-way for the Lake Hattie Reservoir includes an additional fifty feet along the marginal limits thereof.

## STATEMENT REGARDING ORAL ARGUMENT

The Plaintiffs desire oral argument in this matter. Oral argument is appropriate due to the complexity of the factual and legal arguments in this matter.

RESPECTFULLY SUBMITTED this 26th day of January 2022.

/s/ Brandon L. Jensen
Brandon L. Jensen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
brandon@buddfalen.com

*Attorney for Appellants*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.     This document complies with the word limit of Fed. R.
App. P. 32(a)(7)(B)(i) because, excluding the parts of the document
exempted by Fed. R. App. P. 32(f), this document contains 12,650
words.

2.     This document complies with the typeface requirements
of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R.
App. P. 32(a)(6) because this document has been prepared in a
proportionally spaced typeface using Microsoft Word 2016 in font
size 14 and type style Bookman Old Style.

Dated January 26, 2022

/s/ Brandon L. Jensen
Brandon L. Jensen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
brandon@buddfalen.com

*Attorney for Appellants*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

1.    All required privacy redactions have been made per 10th Cir. R. 25.5.

2.    If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

3.    The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, and according to the program are free of viruses.

Dated January 26, 2022

/s/ Brandon L. Jensen
Brandon L. Jensen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
brandon@buddfalen.com

*Attorney for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of January 2022, I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

M. Greg Weisz
Pence and MacMillan, LLC
172 Carey Avenue, Suite 600
Cheyenne, Wyoming 82001
gweisz@penceandmac.com

/s/ Brandon L. Jensen
Brandon L. Jensen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
brandon@buddfalen.com

*Attorney for Appellants*

**ATTACHMENTS**

Findings of Fact and Conclusions of Law, November 17, 2021

Judgment, November 17, 2021

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| C. MARK CUPPS, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>PIONEER CANAL-LAKE HATTIE<br>IRRIGATION DISTRICT,<br><br>Defendant. | Case No. 2:16-CV-0086-SWS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

At issue in this case is the extent of the easement or right-of-way Defendant holds for the Lake Hattie Reservoir established in the early 1900s. On April 28, 2016 Plaintiffs, owners of tracts of land adjacent to Lake Hattie Reservoir, filed a "Complaint to Quiet Title and Action for Inverse Condemnation" (ECF No. 1). Plaintiffs allege the boundary of Lake Hattie Reservoir and the Defendant's right-of-way, *as established by a 1909 map accompanying Defendant predecessor's right-of-way application and a 1950 BLM resurvey of the reservoir*, does not overlap any of the Plaintiffs' tracts of land; however, in 2015, Defendant began storing additional water in the reservoir on lands belonging to each of the Plaintiffs and allegedly outside the boundary of its right-of-way, resulting in flooding and significant damage to Plaintiffs' respective properties. (*See* First Am. Compl. ("FAC") ¶¶ 40-42, ECF No. 26.) By their Complaint, Plaintiffs seek: an order quieting title to each of the Plaintiffs' respective properties against the

Defendant; an order permanently ejecting Defendant from each of the Plaintiffs' respective properties; an order declaring Defendant has unlawfully taken land and adjudicating damages to each of the Plaintiffs in an amount to be determined at trial; an order declaring the legal duties, obligations and liabilities incident to Defendant's ownership and operation of the Lake Hattie Reservoir; and an injunction prohibiting the Defendant from storing any water on any of the Plaintiffs' respective properties. (FAC at 13-14.)

By its answer and counterclaim, Defendant seeks: a declaration that Plaintiffs' respective property rights are subject to Defendant's valid and existing rights under the Act of 1891, even if the exercise of such rights may affect Plaintiffs in their use, possession and occupancy of their real property parcels; and an order quieting title in favor of Defendant with respect to its easement rights under the Act of 1891. (ECF No. 28 at 22-23.)

## PROCEDURAL BACKGROUND

Following a bench trial during which the parties presented expert testimony and other evidence relating to the boundary and scope of Defendant's right-of-way ("Trial I"), the Court concluded Defendant's right-of-way easement, as intended to be depicted on the 1909 map, extends to a water elevation of 7,277 feet, plus fifty feet horizontally. Finding Plaintiffs' lots subject to an easement in favor of the Defendant to the extent of its right-of-way, that is to an elevation of 7,277 feet (NGVD29 datum), the Court determined Defendant was entitled to an order quieting title in its favor with respect to its easement rights under the Act of 1891. Because Defendant has not exceeded that

elevation in its administration of Lake Hattie Reservoir since at least 2014, the Court dismissed Plaintiffs' claims against Defendant. (*See Findings of Fact and Conclusions of Law*, ECF No. 111.)  Plaintiffs appealed.

In reversing this Court's decision, the Tenth Circuit Court of Appeals found error in the consideration of evidence "beyond the approved map and accompanying field notes." *Cupps et al. v. Pioneer Canal-Lake Hattie Irrig. Dist.*, No. 18-8024, at *19 (10th Cir. Dec. 13, 2019) (unpublished) (ECF No. 125-1) ("Order and Judgment"). Specifically, the appellate court determined, "in the salient light of the statutory and regulatory text, the contents of the map (and field notes) that the Secretary actually approved in this case, the purposes of the approved-map requirement, and our analysis in *Bergland*,[1] the district court erred in considering water elevation as *the* defining feature of the right-of-way in this case and in looking beyond the approved map to determine that elevation." *Id.* at 25 (emphasis in original).   "In sum, the statutory and regulatory framework before us requires that the Irrigation District's right-of-way under the Act be determined by reference to the approved map." *Id.* at 32.   The Court of Appeals remanded the case "for additional proceedings consistent with [its] order and judgment."[2] *Id.* at 33.

---

[1] *City and Cty. of Denver v. Bergland*, 695 F.2d 465 (10th Cir. 1982).

[2] "[T]he scope of the mandate on remand in the Tenth Circuit is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard." *United States v. Walker*, 918 F.3d 1134, 1144 (10th Cir. 2019).   In other words, where the appellate court has not specifically limited the scope of the remand, the district court generally has discretion to expand the retrial beyond the error causing the reversal. *Id.* "This approach has been characterized . . . as a presumption in favor of a general remand." *Dish Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 864 (10th Cir. 2014) (internal quotation marks and citation omitted).   "If there are no specific limitations, therefore, the district court may review any relevant evidence the court could have heard at the first [bench trial]." *Walker*, 918 F.3d at 1144 (internal quotation and citation omitted).

On remand, the Court allowed discovery regarding, and set a bench trial to determine, the actual physical location of the surveyed line depicted on the 1909 map.[3] (*See* ECF Nos. 144, 152.)   At the second bench trial ("Trial II"), the parties again presented expert testimony and evidence in support of their respective positions.   After considering all the testimony and evidence now before Court, the Tenth Circuit's Order and Judgment on appeal, and other relevant authority, the Court finds and concludes as follows:

### FINDINGS OF FACT

1.   Defendant Pioneer Canal-Lake Hattie Irrigation District ("PCLHID")[4] now owns and operates Lake Hattie Reservoir, which is located southwest of Laramie in Albany County, Wyoming.   On or about September 18, 1908, Z. E. Sevison, a licensed engineer, submitted to the State Engineer's Office an "Application for a Permit to Enlarge the Lake Hattie Reservoir, and **to Store the Unappropriated Water** of the State of Wyoming."   (*See* ECF No. 12-5 at 136-40) (emphasis added).   The Application was apparently accompanied by a map prepared by Mr. Sevison and "made from notes taken during an actual survey" done September 10-12, 1908, depicting the proposed enlargement of the reservoir.   (ECF No. 52-14.)   The Application, along with the face of the map, show a gross area of 2,345 acres, a capacity of 93,800 acre feet,[5] a depth of 40

---

[3] Prior to the first trial, neither party's expert had attempted to retrace the entirety of the line depicted on the 1909 map but both agreed it could be done.   (*See* Trial I Tr. 68:20-23, 180:20-22, 202:6-12; Coffey Trial II Direct Test. at 2, ECF No. 164.)

[4] The PCLHID is the successor-in-interest to the Laramie Rivers Company.

[5] Approximately 30,000 acre-feet is dead storage at an elevation of 7251.9 feet.   (*See* Def.'s Trial II Ex. A-1.)   The portion of a reservoir below the elevation of the lowest outlet works is referred to as "dead storage" because "its principal purpose is to serve as a depository for water-borne sediment entering the reservoir."   *Oklahoma v. New*

feet, and the dimensions of the dam, including the height of the dam *above water line when full* at eight (8) feet.  The map also shows an original ground surface elevation of 7,250 feet and a "high water line" elevation (spillway) of 7,290 feet.[6]  *Id*.  The Application further contains the following language:  "All rights acquired by the party of the first part herein assigned to the Lake Hattie Res[ervoir] Co."  (ECF No. 12-5 at 137; *see also* Def.'s Trial I Ex. H-1, "Application for a Permit to Construct the Lake Hattie Reservoir" dated May 11, 1908 ("All rights re-assigned to The Lake Hattie Reservoir and Irrigation Company")).[7]  The State Engineer approved the Application on September 23, 1908.  (Def.'s Trial I Exs. H-1, J-1.)  The water rights for Lake Hattie Reservoir include a storage water right with a priority date of May 11, 1908 for 28,426 acre-feet, including 300 acre-feet of temporarily-stored water for use in the Wyoming Game and Fish Department's Twin Buttes Reservoir, and a storage water right with a priority date of January 5, 1986 for 36,834 acre-feet, totaling 65,260 acre-feet active storage.  (Def.'s Trial II Ex. A-1.)

2.    In September, 1909, Defendant's predecessor-in-interest – the Lake Hattie Reservoir & Irrigation Company – submitted a survey map of the proposed boundaries of

---

*Mexico*, 501 U.S. 221, 240 n.10 (1991).  "Below that elevation, no water in the reservoir can be released by natural gravity flow."  *Id.*

[6] Later records establish the high-water elevation (spillway) of Lake Hattie Reservoir is 7,278 feet. (Def.'s Trial II Ex. A-1.)  Defendant's expert, David R. Coffey, a licensed Professional Engineer and Professional Land Surveyor, opines that the discrepancy is likely due to different elevation datum used, and the elevation of 7,290 feet indicated on the 1908 map is equivalent to a high-water elevation of 7,278 feet (NGVD29 datum) today.  (Coffey Aff. ¶ 8, ECF No. 52-19.)

[7] The record reflects there were two applications for a permit submitted to the State of Wyoming relating to the construction of Lake Hattie Reservoir, resulting in approval of Permit No. 1372 Res. – one dated May 11, 1908 ("Application for a Permit to Construct the Lake Hattie Reservoir"), and one dated September 18, 1908 ("Application for Permit to Enlarge the Lake Hattie Reservoir").  (*See* Def.'s Trial I Exs. H-1, J-1.)  The dimensions of the dam indicated on the 9/18/1908 application correspond with the dimensions shown on the contemporaneous map.

the Lake Hattie Reservoir and Canals to the Department of the Interior ("DOI") for approval of an easement under the Act of 1891.  (*See* Pls.' Trial II Ex. 3.)  The Chief Engineer for the project, W. H. Rosecrans, certified on the face of the map the following:

> [T]he surveys of the said reservoir and canals represent **Level lines**, which are the **proposed water lines of the reservoirs** and the proposed grade lines of the canals, and that such surveys are accurately represented on the accompanying map and by the accompanying field notes and no lake or lake bed . . . is used for said reservoirs and canals, except as shown on these maps.

(*Id.* (emphasis added);[8] *see also* ECF No. 49-5 (enlarged portion of map)).    The Defendant's predecessor-in-interest also certified on the face of the map "that the surveys of the said Lake Hattie Reservoir and Canals are **correctly represented on this map and by the accompanying field notes** . . . [and] were adopted by the said Company . . . as **the definite location** of said Company's Reservoir and Canals described as (Lake Hattie Reservoir) (Enlargement of Pioneer Canal,) Supply Canal and Outlet Canal[,] the initial point of surveys, areas of Reservoir and all other necessary information being correctly shown on the map . . . ."  (Pls.' Trial II Ex. 3 (emphasis added); *see also* ECF No. 49-6 (enlarged portion of map)).   Thus, the 1909 Rosecrans map depicted the entire Lake Hattie Reservoir system, including the diversion point on the Laramie River, the canal to convey the water to a temporary storage reservoir, the canal to fill Lake Hattie Reservoir, Lake Hattie Reservoir itself, and the beginning portion of the outlet canal from the reservoir.  The Company further represented:

---

[8] Presumably, the 1909 Rosecrans map refers to "reservoirs" (plural) because it also shows a smaller reservoir known as Sodergreen Lake.

> [T]his map has been prepared to be filed [] with the approval of the
> Secretary of the Interior, in order that the Company may obtain the benefits
> of sections 18 to 21 inclusive of the Act of Congress, approved March 3rd
> 1891 . . . and for other purposes and section 2 of the Act approved May 11,
> 1898 . . . for the **main purpose of irrigation**.

(*Id.*) (emphasis added).

　　　3.　　According to the field notes accompanying the map: "In **running the line**

**of the reservoir** the distances were determined by stadia on a self-reading rod divided

into feet and tenths, which served at the same time as a **level** rod to determine **the true**

**water line**." (Pls.' Trial II Ex. 2 at 3) (emphasis added).  Neither the map nor the field

notes reference the intended elevation of the water line of the reservoir; however, it is

clear from Rosecrans' notes and certification that he intended to lay out the lines for Lake

Hattie Reservoir at a certain elevation level, being the "level lines" he referred to.  (*See*

Trial I Tr. 57:1-24 (Cross-Exam. Test. of Pls.' Expert Jeffrey B. Jones); ECF No. 99-1 at

6 (Trial I Direct Test. of Def.'s Expert David R. Coffey).)

　　　4.　　On February 14, 1911, the DOI approved the map of Lake Hattie Reservoir

"filed under the provisions of the act of March 3, 1891 . . . as an application for an

easement for a reservoir and right of way for the canals." (Def.'s Trial I Ex. F.)  The DOI

approval letter does not make any reference to a proposed or intended elevation of the

reservoir water line.

5.    A report on the irrigation project of the Laramie Water Company[9] by J.G. White & Company, Engineers, dated September 24, 1912, indicates a high-water mark (spillway) elevation of 7,278 feet and an elevation of the crest of the dam at 7,285 feet for Lake Hattie Reservoir.  (ECF No. 52-7 at 54.)  The elevations of the spillway and the crest of the dam have remained the same over time.  (*See* Def.'s Trial I Ex. U-1, Supp. Ex. Y-1.)  The parties agree the present elevation of the spillway at Lake Hattie Reservoir is 7,278 feet (NGVD29 datum).  (*See* Trial I Tr. 55:23-56:3, 162:11-13.)

6.    As proof of construction, the Defendant's predecessor-in-interest submitted an affidavit to the Department of the Interior in September of 1923.  (*See* Def.'s Trial II Ex. F, Affidavit of C.E. Fey, Treasurer and First Assistant Secretary of Laramie Water Company.)  According to Mr. Fey, based on "his personal observation on the ground" and "records of the said Laramie Water Company," construction of the "outlet works, **spillway**, and earthwork [and concrete facing] of the dam" of Lake Hattie Reservoir began in 1909 and was completed in 1912, and "the constructed Lake Hattie Reservoir . . . **conforms to the map and field notes which received the approval** of the Assistant Secretary of the Interior on the fourteenth day of February, 1911."  (*Id.*) (emphasis added).  Mr. Fey further stated "the company has in all things complied with the requirements of the act of Congress of March 3, 1891, and Section 2 of the Act of May 11, 1896."  (ECF No. 49-1 at 20.)

---

[9] The Laramie Water Company was the successor-in-interest to Lake Hattie Reservoir & Irrigation Company.  (*See* Def.'s Ex. F.)

7.      Similarly, the civil engineer responsible for the surveys of the reservoir

from July 1910 to March 1912 and for supervision of construction for Laramie Water

Company from March 1912 to October 1913, Lyman E. Bishop, also submitted an

affidavit dated November 7, 1923 confirming the construction of the reservoir, which was

completed in the fall of 1912. (*See* Def.'s Trial II Ex. F.)  According to Mr. Bishop:

> [T]he traverse of **the shore line** of the Lake Hattie Reservoir **when filled to
> full capacity level** is as given in the Field Notes accompanying [the right-
> of-way application]; . . . and that said Lake Hattie Reservoir as constructed
> conforms to the map and accompanying field notes . . . which were
> approved by the First Assistant Secretary of the Interior on February
> Fourteenth, 1911.

(*Id*.) (emphasis added).  After submission of proof of construction, the Department of the

Interior concluded the "affidavits of the engineer, under whose supervision the project

was constructed and the certificates of the president of the company, show that each of

the above mentioned projects [including the Lake Hattie Reservoir] . . . ha[s] been

constructed and completed exactly in conformity with the specifications. . . .  The

evidence of construction of the Lake Hattie Reservoir . . . is considered satisfactory and

the **easement is earned**."  (*Id.*, Letter from General Land Office dated November 27,

1923) (emphasis added).

8.      On August 27, 1951, under the Small Tract Act of June 1, 1938, the

Department of the Interior issued Classification Order No. 10, declaring 47.53 acres of

land in Albany County, Wyoming available for lease "only for cabin sites."[10]  *See* 16 Fed.

---

[10] The Small Tract Act provided:

Reg. 9288-89 (Sept. 13, 1951). Classification Order No. 10 subdivided the land into 50 tracts, each approximately one acre in size, "most of which adjoin Lake Hattie Reservoir." *Id.* at 9288. The tracts were identified following a resurvey of that portion of the reservoir and surrounding area performed by the Bureau of Land Management ("BLM") between October 12, 1949 and April 3, 1950 and approved June 13, 1950.[11] (*Id.*; *see also* Pls.' Trial II Exs. 5 & 6.) In preparation for the resurvey, the BLM's Regional Chief of Engineering, William R. Bandy, asked a local surveyor to "secure a copy of the **traverse of the highwater line** of Lake Hattie" and "copies of the field notes showing the bearings and distances along this right-of-way." (Pl.'s Trial II Ex.4 at 2, Memo dated September 28, 1949) (emphasis added).

9.     The surveyor, J.Q. Naret, responded that he had located the 1909 map, which "seem[ed] to be the only relevant map . . . fixing the definite limit on the right of way granted for the reservoir." (*Id.* at 3, Memo dated September 30, 1949.) The surveyor further opined, however, the **map was of "doubtful value"** because it omitted "numerous courses and distances describing the traverse of the reservoir." (*Id.*) (emphasis added). The surveyor also stated he had not located the field notes, which he "consider[ed] essential." (*Id.*)

---

The Secretary of the Interior . . . is authorized to sell or lease . . . a tract of not exceeding five acres of any vacant, unreserved, surveyed public land . . ., which the Secretary may classify as *chiefly valuable as a home, cabin,* camp, health, convalescent, recreational, or business site . . . .

52 Stat. 609 (June 1, 1938) (emphasis added).

[11] It appears the field work was completed by October 28, 1949. (*See* Pls.' Trial II Ex. 4, Memo to Thomas W. Crawford dated Oct. 28, 1949.)

10.     Despite these shortcomings, field notes from the re-survey indicate BLM surveyors used the 1909 map as a reference point and located what they believed were old surveyor's stakes remaining from the original survey, including several wooden stakes and mounds of stone. (Pls.' Trial II Ex. 5). The field notes specifically note the recovery of "old stakes" in varying conditions, including "firmly in the ground," "decayed," and "loose" as well as a different type of stake noted as "old, decayed surveyors' stake." (*Id.*) On the south side of the reservoir, being the north side of the small tracts, they note seven (7) recovered stakes, and on the north side of the reservoir, being the south side of the small tracts, they note five (5) additional stakes being recovered. (*Id.*)

11.     Further, in attempting to retrace the survey of Mr. Rosecrans, the BLM's field notes state that a "correction of two minutes to the right is necessary. This adjustment is applied to the record courses of the right-of-way-survey, between identified angle points." (Pls.' Trial II Ex. 5 at 6.) The field notes further state "the difference in departures of the record and found on the ground is negligible." (*Id.*)

12.     The plat ultimately resulting from the 1950 BLM resurvey stated that it "represents a retracement and reestablishment of portions of the section boundaries and the high-water line of the reservoir, designed to restore the corners in their original locations, and the subdivision of a portion of the section." (Pls.' Trial II Ex. 6.) The field notes for the survey and the survey itself indicate each of the tracts was, or at least was intended to be, located "south of the reservoir right-of-way." (*See id.*; *see also* Pls.' Trial II Ex. 5 (field notes stating "[a] line is established south of the reservoir right-of-way

approximately 10 feet above the **present water line** of the lake, on which the north end

of the lots facing the lake are established") (emphasis added).)[12]

13.    Pursuant to Classification Order No. 10, lessees of the tracts were "required

. . . to construct upon the leased land . . . improvements which in the circumstances are

presentable, substantial and appropriate for the use for which the lease is issued." 16 Fed.

Reg. at 9289, ¶ 10; *see also* ECF No. 49-3 ("Improvement Requirements Under the

Terms of the Leases Under the Small Tract Act for Tracts Near Lake Hattie Reservoir").

Between 1959 and 1963, patents were issued by the United States to each of the

Plaintiffs' predecessors-in-interest based upon the 1950 survey. (*See* Def.'s Trial II Ex.

H.) Each of the patents was:

> **subject to any vested and accrued water rights** for mining, agricultural,
> manufacturing, or other purposes, **and rights to** ditches and **reservoirs
> used in connection with such water rights**, as may be recognized and
> acknowledged by the local customs, laws, and decisions of courts; . . . and
> there is reserved from the lands hereby granted, a right of way thereon for
> ditches or canals constructed by the authority of the United States.

(*Id.*) (emphasis added).  None of the patents made specific reference to either the Lake

Hattie Reservoir or any right-of-way issued pursuant to the Act of 1891.  However,

several of the Plaintiffs obtained title insurance policies when they purchased their lots

which expressly excluded coverage for loss or damage by reason of:

> Any and all instruments of record which relate to what are generally known
> as the **Lake Hattie Irrigation System**, the Laramie Water Irrigation
> System, the Laramie Rivers Company Irrigation System, **and any and all**

---

[12] Four lots numbered 51 (2.87 acres), 52 (2.65 acres), 53 (1.92 acres) and 54 (3.10 acres) were platted in-between
the Lake Hattie Reservoir and the fifty tracts. (*See* Pls.' Ex. 6.)  These four lots were not available for lease but were
reserved for public access to Lake Hattie Reservoir. *See* Classification Order No. 10, 16 Fed. Reg. at 9288 ("Lots
numbered 51, 52, 53 and 54 of this same section are not available for lease but are reserved for public access.").

> **instruments of record pertaining to** ditches, **reservoirs,** canals, permits or certificates of appropriation, and any other instruments of record pertaining to water and the transportation thereof.

(Def.'s Trial I Ex. K-1 at 2) (emphasis added).

14.     The records relating to the 1950 BLM survey create doubt as to its accuracy in actually retracing the 1909 Rosecrans line or determining the extent of Defendant's easement. The field notes indicate that the Lake Hattie Reservoir boundaries identified in the 1950 BLM survey were based on the water line *at that time*[13] and not based on an independent determination of the scope and extent of the right-of-way granted upon approval of the 1909 map pursuant to the Act of 1891. The Special Instructions dated October 6, 1949 – which Plaintiffs assert guided the resurvey of the boundaries of Lake Hattie Reservoir and survey of the small tracts[14] – set forth three components to be followed in surveying "a line south of or above th[e] right-of-way boundary to form the limits of the ends of the lots facing the reservoir." (*See* Pls.' Trial II Ex. 4.)

> This boundary line for the lots should be kept at approximately ten feet **vertical** height above the present water level, and should also be kept a **minimum of forty feet from the right-of-way boundary**. This is to leave a passage way at least forty feet in width between the right-of-way

---

[13] While not stated, it is evident that the then-present water line was at a lower elevation given the time of year, which was necessary to enable the surveyors to physically conduct the survey. (*See* Pls.' Trial II Ex. 4, Memo to the BLM "Director" dated Oct. 25, 1949 ("in order to have the work done this season it was necessary to assign an engineer to this work at once").)

[14] There is likewise doubt as to whether these instructions were provided to the surveyors prior to completion of their work or whether, in fact, different special instructions not in the record were actually followed. (*See* Pls.' Trial II Ex. 6, 1950 BLM Survey Map ("Survey executed by Thomas W. Crawford beginning October 12, 1949 and completed April 3, 1950 under special instructions . . . dated February 24, 1950."); Pls.' Trial II Ex. 4, Memo to Thomas W. Crawford dated Oct. 5, 1949 ("The instructions have not yet been prepared and we do not know yet exactly what work there is to do . . ."); *Id.*, Memo to the BLM "Director" dated Oct. 25, 1949 ("[Mr. Crawford] made the preliminary retracements and resurveys and reestablished the reservoir boundary right-of-way line while the Special Instructions for the survey for the villa sites were being prepared . . . ."); *Id.*, Memo to Thomas W. Crawford dated Oct. 28, 1949 ("We had to assign you to this work before the Special Instructions were written, and even before we knew ourselves how we wanted the work done.").)

boundary and the lots, and to keep the lots **above the high water elevation** of the reservoir.

(*Id.*) (emphasis added).  Nothing in the field notes suggests the BLM made an effort to determine the "high water elevation" of the reservoir.  The BLM's 1950 attempted retracement of the Rosecrans line treated that line as a fixed, two-dimensional line defining the easement boundary.  However, the forces of erosion likely altered the topographic features and physical layout of Lake Hattie Reservoir since it was first constructed.[15]  (Coffey Trial I Direct Test. at 11; Braeden Hyde Trial II Direct Test. at 4.)

15.    Moreover, on the face of the 1909 map, Rosecrans expressly stated his intent to depict "level lines," necessarily at some elevation,[16] but the lines were not level at the time BLM attempted to retrace the Rosecrans survey.  (Trial I Tr. at 58-59 (Test. of Jones), 208:1-3 (Test. of Coffey).)  While the 1949-50 BLM survey discusses the then-present water line of Lake Hattie Reservoir, that line cannot represent the high-water line or a fixed boundary of the reservoir because the field notes of the survey contain some survey calls that indicate the line being retraced in certain areas disappears below the actual water level of Lake Hattie Reservoir encountered at that time.  (Coffey Trial I Direct Test. at 9; *see also* Pls.' Trial II Ex. 5, Field Notes ("A part of the right-of-way line is below the present water line of the lake.").)  Neither the 1950 survey nor associated field notes refer to the elevation of either the reservoir's high-water line or then-present

---

[15] "Lake Hattie Reservoir is located . . . in an area known for high winds on a year-round basis.  As a result, . . . [t]he physical boundaries of Lake Hattie Reservoir constantly change due to erosion, wave action and accretion and reliction of the lake boundary."  (Coffey Trial I Direct Test. at 2.)

[16] "A level line is a line that is run of equivalent elevation."  (Trial I Tr. 135:2-3, 160:13-17 (Coffey Test.); *see also* Trial I Tr. 57:7-8 (Jones Test.) ("A level line would be by definition a horizontal, flat plane at a single constant elevation.").)

water line.  Nor does the BLM survey attempt, in any way, to determine or document the elevation of the 1909 Rosecrans survey line or of its retracement of that line.  (*See* Coffey Trial I Direct Test. at 9.)  Indeed, the BLM made no effort to retrace the Rosecrans line at one consistent elevation.  (Trial I Tr. at 32, Cross-Exam. Test. of Jones.)  Rather, the supposed boundary line as retraced by the BLM in 1949-50, and again by Plaintiff's expert for purposes of this case, varies dramatically in elevation, depending on the area of the lake in question.  (Coffey Trial I Direct Test. at 12; *see also* Def.'s Trial I Ex. N-1.)

16.    In 1996, the BLM conducted a dependent resurvey of a portion of Lake Hattie Reservoir in the area of the fifty small tracts to "identify Federal land boundaries within and adjacent to the Small Tract Surveys along the southern shore of Lake Hattie." (Pls.' Trial II Ex. 7 at 1.)  Preliminary to the resurvey, the lines of the previous surveys were retraced.  (Pls.' Trial II Ex. 8 at 3.)  This resurvey does not state or infer that the 1949-1950 BLM survey was flawed, incorrect, or erroneous in any way.

17.    In August of 2016, Plaintiff's expert, Jeffrey Jones, directed the performance of a bathymetric survey of the bottom of the reservoir to determine "the *current* elevation of the points indicated in the Rosecrans survey *as it was retraced by the BLM*."  (Jones Trial I Direct Test. at 11) (emphasis added).  This survey shows twenty-four coincidental locations with elevations that are noted in the 1949-50 BLM survey, all of which were under water at the time of the bathymetric survey.  (*Id*.)  Based on a finding that six of the twenty-four spot elevations (or 25%) are within one foot of 7,258 feet, Mr. Jones opines that the elevation of the water line of the Lake Hattie Reservoir as depicted on the 1909 Rosecrans survey is 7,258 feet.  Mr. Jones doesn't explain why this

number is "statistically significant" (*id.*), and the Court notes that eighteen (or 75%) of the twenty-four survey points are at elevations *other than* 7,258 feet.  Further, Mr. Jones did not take into consideration the substantial accretion and reliction from wind action, wave action and currents Lake Hattie Reservoir has likely experienced over the century it has been in operation and use.  (Trial I Tr. at 62-63; *see also* Coffey Trial I Direct Test. at 11; Hyde Trial II Direct Test. at 4-6.)  Mr. Jones does not know whether the various survey points laid by Rosecrans in 1909 are at different elevations today than they were in 1909, or during the BLM's 1950 retracement of the Rosecrans line.  (Trial I Tr. at 60-61.)

18.    Prior to 2021, neither the Plaintiffs, the Defendant, nor the BLM had conducted a survey of the entire reservoir; all of the prior resurvey work was confined to one small part of the reservoir.  (Coffey Trial II Direct Test. at 2-3.)  In the spring of 2021, David R. Coffey, Defendant's expert witness, and his employees carried out an intensive survey of the entire Lake Hattie Reservoir, of both the shoreline/area above the water and the area covered in water.  (*Id.* at 3.).

19.    Coffey's spring 2021 survey revealed that the prior assumption made by Mr. Coffey, the Plaintiffs' surveyor, and this Court – that the Rosecrans line had been laid out as a level line – was not accurate.  The spring 2021 survey by Coffey instead demonstrated the Rosecrans survey contained a number of mistakes, errors, and failures to fully utilize the capabilities of the equipment used or which was readily available.  Coffey's 2021 survey showed dramatic variations in elevation of the intended level line, as well as mistakes in both the angle and distance of various survey calls.  (*Id.* at 4-7.)

Coffey ultimately determined the Rosecrans line has one (1) foot of error for every four hundred thirty (430) feet of the line traversed, resulting in a failure to close by over one hundred eighty-four (184) feet. (*Id*. at 4; *see also* Trial II Tr. 75:18-20.)  Rosecrans' misclosure was almost double the standard mandated by the 1902 General Land Office Manual of Surveying Instructions for the Survey of the Public Lands of the United Sates and Private Land Claims (Def.'s Trial II Ex. S-1 at 66). (*See* Trial II Tr. 51:7-20, 163:11-14.)

20.     Coffey attempted to retrace the Rosecrans line by making "a tremendous amount of assumptions and adjustments" to try to locate the retraced line on the ground. (Coffey Trial II Direct Test. at 3, 9; Trial II Tr. 183:15-16.)  However, Coffey's 2021 survey led him to conclude that a retraced Rosecrans line cannot be located on the ground today with any reliability or accuracy.  (Coffey Trial II Direct Test. at 4, 9; Trial II Tr. 183-86.)  Because of errors made by Rosecrans, any surveyor who now attempts to retrace the Rosecrans line will likely map out that line in a different location from another surveyor also attempting to retrace that line.  (Trial II Tr. 183:15-184:22.)

21.     Rosecrans expressly intended his 1909 survey line – as depicted on the map accompanying Lake Hattie Reservoir & Irrigation Co.'s application for a right-of-way easement – to "represent [a] level line[]" depicting the "true water line" at an assumed consistent water level (*see* 1909 map and accompanying field notes), as it must

necessarily be in defining the scope of an easement for the storage of water.[17]  (*See* Coffey Trial I Direct Test. at 6, 8; Coffey Trial II Direct Test. at 5.)  However, he did not achieve this goal.  (Coffey Trial II Direct Test. at 5.)

22.     In the second bench trial, David Coffey presented a survey map (Sheet 3) depicting what he believes to be the intended location of the Rosecrans line, based on Mr. Rosecrans' stated intention to represent a level line depicting the true water line of the reservoir.  (Coffey Trial II Direct Test. at 12; Def.'s Trial II Ex. D-3, Sheet 3.)  Coffey testified he did not choose the location of the Rosecrans line shown on Sheet 3 based on elevation, but instead based on the conformity of a portion of the retraced Rosecrans line with the physical location of the reservoir's spillway, which has not changed in any material way since the reservoir was constructed.  (Coffey Trial II Direct Test. at 12, 19; Trial II Tr. at 189-90.)  As Mr. Coffey testified, there were portions of the Rosecrans survey that do in fact reflect the true location of the Rosecrans line, and the close correlation between the retraced Rosecrans line and the physical configuration, topography, and location of the spillway is a strong indication of the on-the-ground location of that line.[18]  (Coffey Trial II Direct Test. at 13, 17.)  Defendant "earned" its easement after submitting proof of construction to the Department of the Interior, which included a representation that construction of the spillway "conforms to the map and field notes" previously approved.  Lake Hattie's high-water line is "physically dictated by the

---

[17] Water seeks its own level; thus, when stored in a basin, the surface is all the same level or elevation (except for minor variations due to wave action).  (Coffey Third Aff. ¶¶ 22-23, ECF No. 73-2.)

[18] When the Court issued its Findings and Conclusions following the first trial, the record contained no direct evidence that any of the correlating survey points are on the spillway.  (*See* ECF No. 111 at 12.)

height of the reservoir's spillway." *Cupps v. Pioneer Canal-Lake Hattie Irrigation Dist.*, 955 F.3d 850, 852 (10th Cir. 2020) (Carson, J., dissenting from the denial of rehearing en banc).

23.     As Defendant's expert testified (*see* Coffey Trial II Direct Test. at 13-16) and as discussed above, the 1949-50 BLM resurvey contained a number of problems, errors, and mistakes in the BLM's attempt to retrace the 1909 Rosecrans line and determine the extent of Defendant's easement.   The BLM's failure to recognize the inconsistencies and problems in the Rosecrans survey perpetuated Mr. Rosecrans' various errors and resulted in the BLM itself creating the problems that both the irrigation district and the cabin owners are experiencing today: the irrigation district's water stored in Lake Hattie Reservoir does in fact occupy portions of the Plaintiffs' cabin lots because the BLM failed to lay out those cabin lots above the actual high-water line of Lake Hattie Reservoir. (*See* Coffey Trial II Direct Test. at 16.)

24.     It is undisputed the 1909 Rosecrans survey contained errors, particularly a significant closure error.   (Coffey Trial II Direct Test. at 7; Trial II Tr. 51:7-15.) Plaintiffs contend the assumptions and adjustments to the Rosecrans line made for the line depicted on Coffey's Sheet 2 is an accurate representation of the Rosecrans line on the ground today as it lies in relatively close proximity to the BLM's 1949-50 retracement.[19] (*See* Pls.' Closing Statement at 8-9, ECF No. 183; Def.'s Trial II Ex. D-3, Sheet 2.)  However, accepting Sheet 2's two-dimensional line as the reservoir boundary

---

[19] Plaintiffs' expert, Jeffrey Jones, admitted that as different surveyors attempt to retrace the Rosecrans line, different surveyors will get different results because there are a multitude of different methods to make corrections. (Trial II Tr. 42:6-17.)

ignores Rosecrans' intent to represent a *level* line and disregards the reality of the "third dimension" ("vertical location" or "depth/elevation") which must necessarily be considered when establishing an easement to store water.  (*See* Trial II Tr. at 76:20-77:16, 186:7-187:2, 234:7-9, 237:4-238:8.)  The line shown on Coffey's Sheet 2 is not a level line and some portions of that line are *below the dead-pool level* of the reservoir. (Trial II Tr. 184:25-185:4.)  Thus, acceptance of the two-dimensional line urged by Plaintiffs as the reservoir easement boundary would not allow Defendant to store any of its 1908 or 1986 water rights in Lake Hattie Reservoir.  (Trial II Tr. 112:2-22.) Moreover, the elevations of a two-dimensional line of the reservoir easement will undoubtedly fluctuate over time due to ongoing erosion, accretion and reliction (Hyde Trial II Direct Test. at 4-7; Coffey Trial I Direct Test. at 11), making management of the reservoir difficult at best, impossible at worst (Coffey Third Aff. ¶¶ 22-23; Trial II Tr. 77:9-16). The illogical nature of Plaintiffs' argument is obvious.

25.     The blue line shown in Coffey's Sheet 3 and Sheet 4 is a reliable, accurate, and readily-identifiable depiction of the line Rosecrans intended to lay out as a level line; it can be located on the ground today and is a reliable representation of the intended boundary line and actual high-water line of Lake Hattie Reservoir.  (Coffey Trial II Direct Test. at 12; Def.'s Trial II Ex. D-3.)  Coffey testified: "The blue line is repeatable. It can be made at any point in time and measured at any point in time by any surveyor without a series of assumptions."  (Trial II Tr. 190:8-10.)  Use of that line requires no correction and that line will close.  (Trial II Tr. 190:11-14.)

26.     The blue line shown in Coffey's Sheet 3 and Sheet 4 does in fact overlap with the boundaries of the Plaintiffs' cabin lots.  (Trial II Tr. 201:9-20.)

27.     The blue line shown in Coffey's Sheet 3 and Sheet 4 does not include an additional fifty-foot easement running horizontally from the boundary of the water line. (Trial II Tr. 189:25-190:3.)

28.     The PCLHID has not stored water beyond the level of the spillway.

## CONCLUSIONS OF LAW

1.     A determination of the scope and extent of Defendant's reservoir right-of-way must begin with the Act of 1891.[20]  Section 18 of the Act provided, in pertinent part:

> The right of way through the public lands and reservations of the United States is granted to any canal ditch company, irrigation or drainage district formed for the **purpose of irrigation** or drainage . . . **to the extent of the ground occupied by the water** of any reservoir and any canals and laterals **and fifty feet on each side** of the marginal limits thereof, and, upon presentation of satisfactory showing by the applicant, such additional rights of way as the Secretary of the Interior may deem necessary for the proper operation and maintenance of said reservoirs, canals, and laterals; . . . *Provided*, . . . all maps of location shall be subject to the approval of the department of the Government having jurisdiction of such reservation . . . .

43 U.S.C. § 946 (bold emphasis added).  Section 19 provided:

> Any canal or ditch company desiring to secure the benefits of sections 946 to 949 of this title **shall** . . . **file** with the officer, as the Secretary of the Interior may designate, of the land office for the district where such land is located **a map** of its canal or ditch and reservoir; and **upon the approval thereof** by the Secretary of the Interior the same shall be noted upon the

---

[20] The Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701 et seq., repealed the Act of 1891.  However, FLPMA contained a savings provision pursuant to which rights acquired before October 21, 1976 remain in effect.  *See* 43 U.S.C. § 1701 note (Oct. 21, 1976, P.L. 94-579, § 701, 90 Stat. 2743) (providing "[n]othing in this Act . . . shall be construed as terminating any valid . . . right-of-way, or other land use right or authorization existing on the date of approval of this Act [Oct. 21, 1976]").

plats in said office, and thereafter **all such lands over which such rights of way shall pass shall be disposed of subject to such right of way**.

*Id*. § 947 (emphasis added).  *See also* Mar. 3, 1891, c. 561, § 19, 26 Stat. 1102.  Thus, the extent and scope of a right-of-way granted under the Act of 1891 is set and determined upon approval of the required map.  *See Kern River Co. v. U.S.*, 257 U.S. 147, 151 (1921) (the grant of a right-of-way under the Act of 1891, §§ 18-21, "was to become effective when the approval [by the Secretary of the Interior of a map of the reservoir] was given; that is to say, the right of way was then to vest in the applicant for the purpose indicated in the act").

2.     Sections 18 and 19 of the Act of 1891 (43 U.S.C. §§ 946 & 947, respectively) are to be construed together, and section 18 does not confer a right independently of the provisions of section 19.  *Union Land & Stock Co. v. U.S.*, 257 F. 635, 639 (9th Cir. 1919); *see also U.S. ex rel. Sierra Land & Water Co. v. Ickes*, 84 F.2d 228, 230 (D.C. Cir. 1936) ("a right of way grant in praesenti does not vest until approval of the application by the secretary").  In its 1894 Circular interpreting and applying sections 18-21 of the Act, the Department of the Interior stated that its purpose in examining the maps and papers of the right-of-way applications was to "ascertain whether the provisions of the act of Congress are properly complied with, whether the proposed works are described in such a manner that the benefits to be granted by the approval of the Secretary of the Interior are defined **so as to avoid future uncertainty**, and whether the rights of other grantees of the government are properly protected from

interference." *See* Circular, Right of Way – Canals, Ditches and Reservoirs, 18 Interior

Dec. 168, ¶ 28 (Feb. 20, 1894) (emphasis added).

3.      In 1908, the Department of the Interior adopted regulations for rights-of-

way obtained under Sections 18-21 of the Act of 1891, requiring that all maps and field

notes conform to the regulations. *See* Regulations for Rights of Way Over Public Lands

and Reservations, 36 Interior Dec. 567 (June 6, 1908). The regulations set forth certain

requirements for the filing of maps and field notes and further provided that a company

"desiring to obtain the benefits of the law must file the papers and maps specified below

with the register of the land district in which the canal, ditch, or reservoir is to be

located." *Id*. ¶¶ 8 & 8(j). The field notes were to be "so complete that from [them] the

surveys **could be accurately retraced** by a competent surveyor with proper

instruments[,] . . . and [t]he **line of survey should be** that of the actual location of the

proposed ditch and, **as exactly as possible, the water line of the proposed reservoir**."

*Id*. ¶ 10 (emphasis added). The maps filed "must be strictly conformable to the field

notes." *Id*. ¶ 11. Upon approval of a map of location by the Secretary of the Interior, the

lines of the canals, ditches, or reservoirs, "**as laid down on the map**," will be marked

upon the township plats. *Id*. ¶ 22 (emphasis added). Finally, after construction of the

canal, ditch, or reservoir, "[n]o new map will be required, unless there are deviations

from the right of way previously approved, either before or after construction, when there

must be filed new maps and field notes in full, . . . [which] must show clearly the portions

amended . . ., and the location must be described in the forms as the amended survey and

the amended definite location." *Id.* ¶ 23.  The required map, then, was intended to depict, *as exactly as possible*, the location and water line of the reservoir.

4.     Construing Sections 18 and 19 together, and considering the regulatory purpose and requirements of the map, the scope and extent of Defendant's reservoir right-of-way begins with the surveyed water line, as shown on the approved map.[21]  Only in this way does the public have definite notice of the boundaries of the right-of-way for purposes of settlement.  However, the map must also be interpreted in the context of its intended purpose and the riparian jurisprudence and survey principles at the time of the map's creation, particularly given its errors and inaccuracies.

5.     In *Grand View Seepage Reservoirs and Ditches*, First Assistant Secretary Jones determined:  "The high-water line of water having a natural ground shore is the marginal limit thereof within the meaning of section 18 of the act of March 3, 1891, granting rights of way for reservoirs . . . 'to the extent of the ground occupied by the water of the reservoir . . . and fifty feet on each side of the marginal limits thereof[.]'"  43 Pub. Lands Dec. 317 (May 29, 1914) (emphasis added).  However, the Asst. Secretary was making a distinction between the marginal limits of water having a natural ground shore and the marginal limits where the water is confined by a dam, as opposed to a difference between the surveyed line on the approved map and the high-water line elevation or spillway of the reservoir.  The *Grand View Seepage* decision further contains

---

[21] *See City and Cty. of Denver*, 695 F.2d at 480 ("[T]he right of way was not granted in recognition of a concept. Denver submitted a map and field notes that it swore accurately represented a proper flow line.  Based on the map and field notes, which were required to 'be so complete that from [them] the surveys could be accurately retraced by a competent surveyor with proper instruments,' . . . Denver was granted a right of way for a specific area.").

language suggesting the surveyed boundaries identified on the approved map are intended to depict the *high-water line* within a reservoir. *Id.* at 320 (referring to "the regulations requiring the survey and fixing of the **high water line** within a reservoir . . . as the marginal limit of such reservoir" and citing 1908 regulations governing the filing of maps [36 Interior Dec. 567, ¶ 11]) (emphasis added).

6.    An earlier DOI decision also supports a finding that the line of survey on the approved map fixes the high-water line or "marginal limit" of the reservoir for purposes of determining the extent of a right-of-way. In concluding the map of a canal, filed with an application for a right-of-way under sections 18-21 of the Act of 1891, "should definitely and accurately show the lines of the canal," the Secretary to the Commissioner of the General Land Office stated:

> [T]he object and purpose of the law in requiring a map of a canal to be filed, that its lines may be noted in the tract-book and records of the land office was that such map should accurately and definitely show the lines of the canal that they should be so marked and noted that a competent surveyor with proper instruments could go upon the ground and retrace the boundary line between the canal and the land of any adjoining proprietor.
>
> The statute gives to the company not only the right to construct a canal across the public lands, but it gives them a perpetual easement for canal purposes in fifty feet on each side of such canal, the meander line being fifty feet from **the high water line**. If there is nothing to determine this line but the flow of water, the rise and fall, the seasons of drought and rainfall will be productive of litigation vexatious and interminable.[22]

---

[22] The *Pecos Irrigation* decision goes on to explain that a map filed in the local office, definitely and accurately showing the lines of the canal, would furnish "accurate or reliable information to the officers of the government, or to persons who might examine it with a view to making settlement on the tract encumbered by this easement." 15 Pub. Lands Dec. at 472-73. *See also Farmers Canal Co.*, 13 Pub. Lands Dec. 166, 167 (Aug. 14, 1891) ("One of the purposes of these maps is to enable the local officers to designate on their records the subdivisions touched by the canal or reservoir for which the right of way is asked.").

*The Pecos Irrigation and Improvement Co.*, 15 Pub. Lands Dec. 470, 472 (Nov. 19, 1892) (emphasis added). "The Department not only has the right, but it is its duty to see that the lines are so fixed and determined that the patentee may know what he is receiving of the government when he takes its patent for the land over which [a] canal is constructed." *Id.* at 473.

7.     Additionally, in *Windsor Reservoir and Canal Co. v. Miller*, First Assistant Secretary Finney concluded, "The extent of the ground occupied by the water of a reservoir, for which a right of way has been granted under [the Act of 1891], must be determined from **the high-water line, as shown by the approved map**." 51 Pub. Lands Dec. 27, 33 (Jan. 10, 1925) (emphasis added). Thus, the surveyed line shown on the 1909 map ultimately approved by the Department of the Interior is the "marginal limits" of the ground occupied by the water of Lake Hattie Reservoir for purposes of determining the extent of Defendant's right-of-way.

8.     At the time Congress passed the 1891 Act, "maps depicting bodies of water employed transitory 'meander' lines 'for the purpose of getting [a reservoir's] general contour . . . .'" *Cupps*, 955 F.3d at 853 (Carson, J. dissenting) (quoting *Mitchell v. Smale*, 140 U.S. 406, 413 (1891)). "Cases have happened in which, by mistake, the meander line described by a surveyor in the field-notes of his survey did not approach the water line intended to be portrayed." *Mitchell*, 140 U.S. at 413. "It has been decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary." *Id.* at 414; *see also Hardin v. Jordan*, 140 U.S. 371, 380 (1891) ("It has frequently been held, both by the federal and state courts, that such

meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered, and that the waters themselves constitute the real boundary.").

9.     The Court of Appeals concluded the DOI defined the PCLHID's rights "by reference to an approved map depicting a specific geographic area; consequently, other factors that arguably could be advanced as bearing on the scope of its rights – whether elevation or the practical infeasibility of using the right-of-way actually depicted on the map – are irrelevant."   (Order and Judgment at 24-25.)   Yet, the appellate court acknowledged the 1891 Act right-of-way easement boundary should, and is intended to, be based on the *high-water line* of the reservoir. (*Id.* at 22-23.)   When stored in a basin, the water line is necessarily a level line at some particular elevation.   By emphasizing this Court's error in using elevation as "*the* defining feature of the right-of-way" (*id.* at 25), the appellate court suggested elevation can be a consideration but cannot be "the" defining feature of the easement boundary.   Furthermore, ignoring the practical infeasibility of using the right-of-way actually depicted on the map disregards the purposes of the 1891 Act – to encourage the irrigation, settlement, and economic growth of the American West. *See Cupps*, 955 F.3d at 853 (Carson, J. dissenting) (citing *Chicala Water Co. v. Lytle Creek Light and Power Co.*, 26 L.D. 520, 524 (1898) ("The regulations adopted by the Department to carry into effect the act of March 3, 1891 (18 L. D., 168), declare that this act is evidently designed to encourage the much needed work of constructing ditches, canals and reservoirs in the arid portion of the country by

granting a right of way over the public lands necessary to the maintenance and use of the same.)).

10.     This Court's initial decision and the Tenth Circuit's Order and Judgment presupposed the accuracy of Rosecrans' 1909 survey map.   However, the evidence presented in the second bench trial, discussed above, establishes significant errors made by Rosecrans in his attempt to lay out a level line depicting the reservoir's boundary. These errors make the line depicted on Rosecrans' 1909 map, in itself, an unreliable source for determining the boundary of PCLHID's right-of-way easement for Lake Hattie Reservoir.   The DOI approved a purported level line for the Lake Hattie Reservoir right-of-way easement when it approved the 1909 Rosecrans survey map that expressly referenced such level line, and the intended true water line for the reservoir.

11.     Where a survey is inaccurate, "the rule as to the intent of the parties must stand." *U.S. v. Big Bend Transit Co.*, 42 F.Supp. 459, 471 (1941). [23]

> The general rule is that in matters of boundaries calls for natural objects and fixed monuments control those of distances.   It is the duty of the Court to ascertain the intention of the parties deduced from the composite of all the evidence.   When the surveyor is mistaken as to the courses and distances, the Court must reconcile the conflicting calls so as to establish the true location.

> Here we have a cause where the conveyance is in the nature of a right of way evidenced by the application and the approval of the map. The granted application clearly called for all land below contour line of 1192. That is what the defendant sought and that was what the Government granted. The intent of the parties was the subject of definite ascertainment.

---

[23] "But ordinary surveys are so loosely made, and so liable to be inaccurate, especially when made in rough or uneven land or forests, that the courses and distances given in the instrument are regarded as more or less uncertain, and always give place, in questions of doubt or discrepancy, to known monuments and boundaries referred to as identifying the land." 42 F. Supp. at 470.

> The errors in the map, whether due to the fault of the Government or the
> defendant, did not detract from the legality of the grant.

*Id.* at 470 (citations omitted).

12.     Similar circumstances are presented here.  As seen in Coffey's Sheet 4

depicting the area of the spillway, the portion of the adjusted Rosecrans line from Sheet 2

runs precisely through the physical location of the spillway. The near-identical location

of the adjusted Rosecrans line and the physical location of the spillway today is a strong

indicator that Rosecrans intended to lay out the level line of the reservoir in accordance

with the location of the spillway.  The Tenth Circuit's ruling highlighted the importance

of the original topography of the reservoir area when it found that the Secretary of the

Interior "approved of a line *fixed to the original topography* because the map does not in

any way indicate that the line is transitory . . . ."  (Order and Judgment at 23) (emphasis

added).  The parties' experts agree the location of the spillway has not changed since its

construction, but other areas around the reservoir most certainly have.

13.     Rosecrans expressed his intent *in writing* – on the face of the 1909 map and

in his field notes – when he stated he intended to represent a "level line" that would serve

as the "true water line" for Lake Hattie Reservoir.  Defendant's expert, David Coffey,

relied on this stated intent in formulating his opinions as to the right-of-way boundary for

Lake Hattie Reservoir.  (Trial II Tr. 233:23-234:5.)  The blue line depicted on Coffey's

Sheet 3 was determined based on location, not a particular elevation. *See, supra* ¶ 22. As

he testified, he found some parts of the adjusted Rosecrans line that demonstrated

Rosecrans' intent.  One factor was the close correlation between the physical location of

the spillway at Lake Hattie Reservoir as it exists today and the Rosecrans line as he retraced it.

14.     The blue line depicted on Coffey's Sheets 3 and 4 falls within the parameters recognized by the Tenth Circuit's ruling. First, that line depicts the high-water line of Lake Hattie Reservoir. Second, Coffey explained he relied on the original topography of the reservoir's spillway and dam areas in determining Rosecrans' intended line. Finally, to the extent Coffey may have given some effect to elevation, such consideration would be entirely appropriate given the reservoir's intended use.

15.     The Act of 1891 plainly refers to three components of an 1891 Act right-of-way easement. First, the statute obviously provides the primary right-of-way line "to the extent of the ground occupied by the water of any reservoir . . . ." 42 U.S.C. § 946. Second, the statute goes on to state the right-of-way includes "fifty feet on each side of the marginal limits thereof . . . ." Finally, it further states that "upon presentation of satisfactory showing by the applicant, [the applicant may obtain] such additional rights of way as the Secretary of the Interior may deem necessary for the proper operation and maintenance of said reservoirs . . . ." Thus, PCLHID is entitled to the right-of-way easement line itself and the fifty feet from the limits thereof as automatically provided by the 1891 Act.

16.     Accordingly, the Court concludes Defendant PCLHID's 1891 Act right-of-way easement for Lake Hattie Reservoir is as depicted by the blue line shown in Defendant's Exhibit D-3, Sheet 3 and Sheet 4, and further extends to the statutorily-mandated fifty feet horizontally therefrom.

17.     Due to the mistakes and shortcomings made by the BLM in conducting its 1950 resurvey, PCLHID's easement boundary overlaps with the boundaries of the Plaintiffs' cabin lots, causing the inundation of Plaintiffs' lots by the water rights lawfully stored in Lake Hattie Reservoir by the PCLHID.  No resurvey or retracement carried out by the Department of the Interior "shall be so executed as to impair the bona fide rights or claims of any claimant, entryman, or owner of lands affected by such resurvey or retracement."  43 U.S.C. § 772.  The United States "is entitled to survey and resurvey what it owns and to establish and reestablish boundaries;" however, in carrying out a resurvey, it "cannot affect the rights of owners on the other side of the line already existing in theory of law."  *Lane v. Darlington*, 249 U.S. 331, 333 (1919).

18.     The Plaintiffs' lots are subject to an easement in favor of the Defendant PCLHID to the line of the spillway, as depicted by the blue line shown in Defendant's Exhibit D-3, Sheet 3 and Sheet 4, and Defendant is entitled to an order quieting title in favor of Defendant with respect to the extent of its easement rights under the Act of 1891.

19.     Because Defendant PCLHID has not exceeded that boundary line in its administration, management, and use of Lake Hattie Reservoir, and thus has not unlawfully possessed or stored water on Plaintiffs' properties, Plaintiffs' claims against Defendant are DISMISSED.

THEREFORE, in accordance with the Court's factual findings and legal conclusions herein, Judgment shall be entered in favor of Defendant and against Plaintiffs.

Dated this 17th day of November, 2021.

Scott W. Skavdahl
United States District Judge



**FILED**

**Margaret Botkins**
**Clerk of Court**

11:34 am, 11/17/21

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

C. MARK CUPPS, et al.,

                                   Plaintiffs

vs                                                  Case Number:  16-CV-86-SWS

PIONEER CANAL-LAKE HATTIE
IRRIGATION DISTRICT,

                                   Defendant

## JUDGMENT IN A CIVIL ACTION

Pursuant to the Findings of Fact and Conclusions of Law (Doc. 187), entered November 17, 2021, which is fully incorporated by this reference,

IT IS HEREBY ORDERED that final judgment is entered in Defendant's favor in accordance with the Court's factual findings and legal conclusions and this action is DISMISSED.

Dated this 17th day of November, 2021.

Margaret Botkins
Clerk of Court

By Kim Blonigen
Deputy Clerk

WY 37

**94**

Rev. 06/17/2020